## MATTER OF KULLE

### In Deportation Proceedings

### A-10857195

*Decided by Board December 10, 1985*

(1) The term "persecution" as used in section 241(a)(19) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(19) (1982), includes the confinement of political prisoners, Jehovah's Witnesses, Protestant and Catholic clergy, Jews, and other opponents of the Nazi regime in the Nazi work camp at Gross-Rosen.

(2) Those persons who actively participated in the management of Nazi concentration camps which included the supervising and training of concentration camp guards engaged in persecution as defined under section 241(a)(19) of the Act.

(3) The respondent, a concentration camp guard at Gross-Rosen, assisted in the persecution of prisoners who, because of their religious and political beliefs, were singled out for harsher treatment.

(4) The respondent was found to have assisted in the persecution of prisoners under section 241(a)(19) of the Act notwithstanding the absence of evidence that his activities were the result of political or religious motivation.

(5) The respondent, who claimed that he merely obeyed orders and was denied a transfer from the Gross-Rosen concentration camp, did assist in persecution and is deportable under section 241(a)(19) of the Act, notwithstanding his claim that his actions were involuntary.

(6) The respondent materially misrepresented his wartime military service to immigration authorities and thus is deportable as excludable at entry under sections 212(a) (19) and (20) of the Act, 8 U.S.C. §§ 1182(a) (19) and (20) (1982).

(7) An alien deportable under section 241(a)(19) of the Act is ineligible for relief from deportation under sections 241(f) and 244 (a) and (e) of the Act, 8 U.S.C. §§ 1251(f) and 1254 (a) and (e) (1982).

CHARGE:

Order: Act of 1952—Sec. 241(a)(1) [8 U.S.C. § 1251(a)(1)]—Excludable at entry under section 212(a)(19) [8 U.S.C. § 1182(a)(19)]—Procured visa by fraud or willful misrepresentation of a material fact

Sec. 241(a)(1) [8 U.S.C. § 1251(a)(1)]—Excludable at entry under section 212(a)(20) [8 U.S.C. § 1182(a)(20)]—No valid immigrant visa

Sec. 241(a)(2) [8 U.S.C. § 1251(a)(2)]—In the United States in violation of section 212(a)(19) [8 U.S.C. § 1182(a)(19)]—Procured visa by fraud or willful misrepresentation of a material fact

Sec. 241(a)(2) [8 U.S.C. § 1251(a)(2)]—In the United States in violation of section 212(a)(20) [8 U.S.C. § 1182(a)(20)]—No valid immigrant visa

Sec. 241(a)(19) [8 U.S.C. § 1251(a)(19)]—Participation in Nazi persecution

ON BEHALF OF RESPONDENT:
Charles W. Nixon, Esquire
29 South LaSalle Street, Suite 340
Chicago, Illinois 60603

ON BEHALF OF SERVICE:
Bruce J. Einhorn
Ronnie L. Edelman
General Attorneys
  Office of Special
  Investigations
  Criminal Division
  U.S. Department of Justice

BY: Milhollan, Chairman; Maniatis, Dunne, Morris, and Vacca, Board Members

The respondent appeals from the immigration judge's decision of November 20, 1984, finding the respondent deportable as charged and denying him relief from deportation. The appeal will be dismissed after a minor modification of the immigration judge's decision.

## PROCEDURAL OVERVIEW

The respondent is a 63-year-old native of the Breslaw district of Silesia, which, at his birth, was a part of Germany and is now a part of Poland. He is still a citizen of Germany and was admitted to the United States for lawful permanent residence on November 7, 1957. On December 3, 1982, the respondent was served with an Order to Show Cause and Notice of Hearing (Form I-221), which alleged that he was deportable under sections 241(a)(1), (2), and (19) of the Immigration and Nationality Act, 8 U.S.C. §§ 1251(a)(1), (2), and (19) (1982).

At his deportation hearing, which commenced on January 17, 1983, the respondent admitted, in substance, 12 of the Government's 18 allegations of fact in the Order to Show Cause but denied all charges of deportability. He also filed motions to terminate the deportation proceedings and various other motions, including a motion for discovery, all of which were denied. In addition, the respondent demanded a trial by jury, which was also denied by the immigration judge. He then sought a writ of mandamus in the United States District Court for the Northern District of Illinois, Eastern Division, seeking to force the immigration judge to compel discovery in these deportation proceedings. Consequently, the de-

portation proceedings were stayed until July 19, 1983, pending a resolution of this writ. The petition for the writ of mandamus was dismissed by the district court on June 23, 1983. *Kulle v. Springer*, 566 F. Supp. 279 (N.D. Ill. 1983).

The deportation hearing reconvened on August 10, 1983, following several continuances granted at the respondent's request. On August 23, 1983, the respondent's hearing was adjourned, again at the respondent's request. The hearing reconvened on September 17, 1983, and the Government completed its case on September 22, 1983. The hearing was again recessed at the respondent's request until November 15, 1983, when the respondent began his case. The hearing was finally closed on November 16, 1983, when the respondent finished presenting his case. After reviewing the 2,971 pages of transcript of the testimony and the copious documentary evidence presented, the immigration judge rendered her 47-page decision on November 20, 1984.

In her decision the immigration judge focused solely on the charge of deportability pursuant to section 241(a)(19) of the Act. She noted that the factual evidence presented related principally to the allegations regarding the respondent's assistance and participation in persecution because of race, religion, nationality, or political opinion. Five of the Government's six witnesses testified solely on this aspect of the case. The immigration judge found the testimony of these witnesses to be credible. Thus, she concluded that the respondent had "assisted and otherwise participated in the persecution of persons because of race, religion, political opinion, or nationality" and was, therefore, deportable under section 241(a)(19) of the Act by evidence which is clear, unequivocal, and convincing, as required by *Woodby v. INS*, 385 U.S. 276 (1966), and 8 C.F.R. § 242.14(a) (1984). Since this finding was dispositive of the issues of deportability and relief from deportation, the immigration judge's decision was based on this conclusion alone. The respondent appealed.

## ALLEGATIONS OF DEPORTABILITY

The Order to Show Cause alleged that on June 20, 1940, the respondent had joined the Waffen Schutzstaffel ("SS"), an organization under the direction of, or in association with, the Nazi government of Germany. He served in the Waffen SS until approximately May 1945 when the Second World War ("WWII") ended. During the period that the respondent was a member of the Waffen SS, he served in its Death's Head ("Totenkopf") Division. His service with the SS Death's Head Division took place in Germany, France, the

Soviet Union, and Austria, and for his services, he received the Iron Cross Second Class.

In August 1942 the respondent was assigned to the SS Death's Head Battalion at Gross-Rosen concentration camp in his native Silesia and remained there until approximately January 1945. During the time he served in the SS Death's Head Battalion at Gross-Rosen concentration camp, he received two promotions: one to the rank of corporal (rottenfuehrer) in October 1942, and another to sergeant (unterscharfuehrer) in approximately September 1943. Among his alleged activities while serving at Gross-Rosen was work as a guard and guard training leader. His work as a guard included the armed guarding of Gross-Rosen prisoners when they were sent to do forced labor. The respondent allegedly served often as group leader of SS guards and was a training supervisor of SS recruits, instructing them in the use of weapons.

The Order to Show Cause further alleges that at the time of the respondent's service the Gross-Rosen concentration camp was a place for persecution of prisoners of the Nazi government of Germany. This persecution included the forcible internment and slave labor of prisoners for reasons of race, religion, national origin, or political opinion. According to the Order to Show Cause, the respondent allegedly ordered, incited, assisted, or otherwise participated in the persecution of the Gross-Rosen concentration camp prisoners, actions which would render him deportable under section 241(a)(19) of the Act.

It is also alleged that in approximately January 1945, while still a sergeant in the Waffen SS, the respondent participated in the forced evacuation of prisoners by train from the Gross-Rosen concentration camp to the Mauthausen concentration camp in Austria. This evacuation, which was conducted in open freight cars, allegedly resulted in the persecution of the evacuated prisoners and thus constitutes another basis for the charge of deportability under section 241(a)(19) of the Act.

When the respondent applied for admission into the United States in 1957, he stated to immigration authorities that during WWII he had served in the German Army rather than in the Waffen SS. The Order to Show Cause therefore alleges that the respondent misrepresented material facts regarding his membership and activities in the Waffen SS when he was seeking admission to this country. This allegation, if true, would support a finding that the respondent is deportable for having entered the United States by fraud and with an invalid visa. See sections 212(a)(19) and (20) of the Act, 8 U.S.C. §§ 1182(a)(19) and (20) (1982), and sections 241(a) (1) and (2).

## THE RESPONDENT'S CONTENTIONS

The case presented by the Government at the respondent's deportation hearing consisted of admissions made by the respondent under oath in a transcribed interview on August 14, 1982; captured SS documents which the respondent executed during WWII; the testimony of six witnesses; and additional documentary evidence. The witnesses included an historical expert, four eyewitness survivors of the Gross-Rosen concentration camp, and a retired Foreign Service Officer who supervised the issuance of immigrant visas at the American Consulate in Frankfurt, Germany, at the time the respondent obtained his visa to enter the United States in September 1957.

The respondent contends that the Government failed to present clear, unequivocal, and convincing evidence that Gross-Rosen was a place where persecution due to race, religion, nationality, or political opinion occurred. He argues that inmates of the Gross-Rosen concentration camp were either criminals or prisoners of war and that the camp was not a place of persecution or extermination. He further claims that the punishment meted out to the prisoners upon their arrival at Gross-Rosen was not persecution. Characterizing Gross-Rosen as a labor camp where prisoners engaged only in forced labor, he distinguishes it from "death camps" like Auschwitz or Treblinka. He also contends that the prisoners of Gross-Rosen were of many nationalities, political beliefs, and religions and that no group was singled out for persecution. Lastly, he alleges that the testimony of the Government's five witnesses was not credible.

Alternatively, the respondent claims that his service at Gross-Rosen was involuntary because he was involuntarily transferred to Gross-Rosen and his application for a transfer from Gross-Rosen was denied. The respondent denies that he was ever inside the protective custody area of the Gross-Rosen concentration camp and contends that he did not know what transpired inside. He also denies that he ever abused, shot, or killed any person in Gross-Rosen. Finally, the respondent raises constitutional arguments against the immigration judge's deportation order.

## THE GOVERNMENT'S EXPERT WITNESS

Dr. Charles W. Sydnor, a historian of Nazi Germany, the SS, and the concentration camp system, was the Government's first witness

at the respondent's deportation proceeding.[1] He testified that between 1933 and 1945 the Government of Germany implemented the racial policies of the National Socialist Party and its leader, Adolf Hitler. The party created a racial hierarchy in which groups such as the Slavs, Great Russians, White Russians, and Jews were labeled inferior. The SS rounded up those politically opposed to the party's position and interned them in what became known as concentration camps. The SS later used these camps as places for the wartime exploitation and extermination of Jews, Slavs, Gypsies, Communists, Soviet prisoners of war, and other captive nationalities and political groups.

According to Dr. Sydnor, the internment center at Dachau, Germany, became a model for other concentration camps, including Gross-Rosen. Heinrich Himmler, the SS chief, molded the Dachau model into a permanent concentration camp staffed with a cadre of Death's Head guards. Dachau's commandant in June 1933 was Theodor Eicke, the founder of the Death's Head units. From those units, SS guards for other concentration camps, including Gross-Rosen, were recruited. The SS at Dachau established precedents for the operation of all Nazi concentration camps, including brutal methods of punishment and slave labor. A system of disciplining prisoners similar to that at Dachau was adopted at Gross-Rosen. Slave labor at places such as Dachau and Gross-Rosen was conducted both inside and outside the camps in work gangs.

The SS guards in Death's Head units were distinguishable from other uniformed Nazis by their insignia of a skull and crossbones (Death's Head) worn on the collar tab of the right side of the uniform. The indoctrination of SS guards emphasized hatred of the National Socialist Party's enemies which included the Jews, freemasons, Bolsheviks, and the churches. *See* C. Sydnor, Jr., *supra* note 1, at 28. With the onset of WWII, the Death's Head units became known as the Death's Head Division. *Id.* at 37.

Dr. Sydnor also testified that in the summer of 1940 the Gross-Rosen concentration camp was a labor camp that was a subdivision of the Sachsenhausen concentration camp. On May 1, 1941, the Gross-Rosen concentration camp became an independent concentration camp with its own commandant and administration and was subordinated directly to the inspector of concentration camps.

---

[1] Dr. Sydnor is a former professor of German history, specializing in the Nazi era, and author of the book, *Soldiers of Destruction*, a history of the SS Death's Head Division. C. Sydnor, Jr., *Soldiers of Destruction, The SS Death's Head Division, 1933–1945* (1977).

Following the German invasion of the Soviet Union, members of the Death's Head Division were regularly transferred from the Eastern Front to SS guard units at concentration camps to assist in exterminating captive racial, religious, national, and political groups. Among those transferred to guard duty at the camps, including Gross-Rosen, were SS men wounded in action and volunteers from the Death's Head Division. Gross-Rosen was located in Silesia, which was near large veins of granite and other hard, heavy stone materials that were needed for building projects. The extraction of stones from these quarries was the primary reason for prisoner labor at the concentration camp. Gross-Rosen continually expanded during WWII, eventually numbering approximately 70 subcamps. As the subcamps proliferated, the main camp at Gross-Rosen continued to grow, expanding to tens of thousands of prisoners by 1945.

The classification of prisoners at Gross-Rosen was reflected on their clothing. Prisoners were issued distinctive uniforms, usually striped, that would make the uniforms easily identifiable if the prisoner tried to escape. Each prisoner also had a distinctive triangular patch of colored cloth sewn on his uniform. Political prisoners wore red patches; those judged to be asocials, a black patch; professional criminals, a green patch; and homosexuals, a pink patch. Before the war Jews had been required to wear a yellow triangular patch. During the war the single yellow patch was replaced by two overlapping triangular patches that formed a Star of David.

The professional criminals, most of whom were Germans, ran a sort of trusty prisoner administration of the camp. They regularly served as kapos or as senior prisoner leaders who were responsible to SS men for the performance of work duties. Placed below the professional criminals were the asocials, who were treated a little more severely. Political prisoners were routinely treated very harshly. Jehovah's Witnesses were similarly treated since they were regarded as especially dangerous religious fanatics. Finally, the Jews received the worst treatment of any of the inmates.

Dr. Sydnor testified that the Gross-Rosen prisoners' day normally began at 5:00 a.m. in the summertime and at 6:00 a.m. in the winter. After breakfast the prisoners were assembled outside their barracks at the Appellplatz for a lengthy roll-call ("appell"). At the completion of this appell the prisoners were ordered to march in quickstep into work companies ("commandos") for labor outside the main camp that was guarded by members of the SS Death's Head Battalion. They then labored until 6:00 or 7:00 in the evening. At noon there was a second roll-call, and a third appell took place at

night, during which time prisoners who had violated camp rules were punished. The prisoners would then eat soup, clean their barracks, and go to bed.

The Death's Head Battalion members also guarded the prisoners from watchtowers and at wire perimeters around the camp. Dr. Sydnor testified that many abuses were committed by SS guards at the worksites outside the main camp. He told of how guards killed prisoners by beating them or forcing them back to work after they had collapsed from exhaustion. SS guards "shot without warning" any unarmed prisoner trying to escape a worksite and were rewarded with special leave for shooting prisoners. The SS guards were themselves supervised at worksites by guard leaders. These were men experienced in the use of firearms who preferably had experience in active combat, especially in Russia. The guard leaders also trained incoming SS recruits.

According to the witness, the SS Death's Head Battalion also assisted in the execution of many unarmed Allied prisoners of war between 1942 and 1945. The battalion was officially commended by the SS leadership for shooting to death captured Soviet soldiers at Gross-Rosen. Members of the battalion also took part in the hanging and execution by lethal injection of many prisoners inside Gross-Rosen.

Gross-Rosen was later employed as a repository for prisoners, sent from concentration camps to the east, who were transferred before the arrival of Soviet armed forces. Dr. Sydnor testified that in late 1943 and 1944 some 10,000 prisoners from Auschwitz were taken to Gross-Rosen. Many of those prisoners were killed at Gross-Rosen by the SS prior to that camp's evacuation early during the winter of 1945 in order to prevent their liberation from the advancing Russian armies. Among the places to which prisoners from Gross-Rosen were evacuated was the Mauthausen concentration camp in Austria.

## THE GOVERNMENT'S EYEWITNESSES

The Government also presented the testimony of four eyewitnesses who were confined in the Gross-Rosen concentration camp during the time the respondent was a guard there. The first eyewitness was Professor Mieczyslaw Moldawa, currently a professor of architecture at the Technical University in Lublin, Poland, who was born in Poland in 1923.[2] He testified that prior to the Nazi in-

---

[2] Professor Moldawa was also the author of the book *Gross-Rosen: A Concentration Camp in Silesia* (1979), which was admitted into evidence during Dr. Sydnor's
*Continued*

vasion of Poland he was a student and a member of a Social Democratic youth organization in Poland known as the Red Scouts. Following the onset of the Nazi occupation of Poland in September 1939, he secretly brought medicine into the Jewish ghetto in Lodz. He was arrested in May 1940 by members of the German Secret State Police because he had written a letter to his father in which he described a speech by Winston Churchill which he had secretly heard over the radio on the British Broadcasting Company. Following his arrest, he was incarcerated in several jails in Austria and Germany. In May 1941 he was transferred to the Dachau concentration camp and in June 1941, along with some 260 inmates of various nationalities, was taken by train from Dachau to Gross-Rosen.

Professor Moldawa testified that the prisoners arrived at the Gross-Rosen train station at night, but the railroad car door was not opened until the following morning. Then, guards in green uniforms with the Totenkopf, or Death's Head insignia, on their shoulders marched the prisoners from the train station up a hill to the main camp, beating them along the way. Once inside the camp property, the prisoners were taken to a receiving barracks and made to undress for delousing and a complete body shaving. Each prisoner was then assigned a number, which he wore on his uniform. In addition, each prisoner received a patch on the shirt of his uniform, which denoted his category of confinement. Dr. Moldawa wore a red patch, an upside-down triangle with the letter "P," which denoted that he was a Polish political prisoner. The prisoners were then made to exercise for 4 hours although they had not eaten for 2 days since leaving Dachau.

Professor Moldawa also testified that for the 3 and ½ years of his incarceration at Gross-Rosen he labored in the construction bureau of the SS. He worked as a draftsman, both in and out of doors, and thus had many opportunities to witness the growth of Gross-Rosen and the activities of the prisoners and the guards. Professor Moldawa also testified that he recalled seeing Jewish prisoners, including women, arrive at Gross-Rosen from Auschwitz in both 1944 and January 1945. Prisoners arriving from Auschwitz were made to sleep on the bare floors of partly constructed stable barracks, which were later called "Oswiecim," the Polish name for Auschwitz. Construction of a gas chamber at Gross-Rosen was begun in the summer of 1944 but was not completed because of a shortage of bricks. Professor Moldawa's description of the typical

testimony. Also admitted into evidence by the immigration judge was a diagram of the Gross-Rosen concentration camp, which was enlarged and taken from that book.

day at Gross-Rosen was consistent with the previous testimony of Dr. Sydnor. He recounted many instances of beatings and death at the guards' hands, as well as other abuses. He also described a similar ranking of camp prisoners on the basis of political opinion and racial group, as well as the sufferings the prisoners endured as a result of their forced evacuation from Gross-Rosen to Mauthausen.

The next witness at the respondent's deportation hearing was Marcel Lubasz, a Jew born in Poland in 1922 and currently residing in Tel Aviv, Israel, where he is a professional surveyor, engineer, and archaelogist. He testified that in the fall of 1942 he was sent by the Nazis to a labor camp, which turned out to be a death camp. He escaped from Nazi custody in 1943 but was recaptured and sent to Gross-Rosen in February 1944, where he remained until January 1945. He was classified as a Polish political prisoner by concealing his Jewish identity and began slave work as a digger, along with about 100 other prisoners. Following his construction work, he was assigned to make rifle straps and was later assigned to work as a technical draftsman in an electronics laboratory. He also gave testimony about beatings and executions similar to that of the prior witnesses regarding conditions at Gross-Rosen.

The next eyewitness was Ludwig Kozlowski, who was born in Poland in 1923, came to the United States in 1953, and is now a United States citizen. He testified that his mother was executed by the Germans because she was accused of being a Jew. He was told by the German authorities that he had to go to work in Germany, where he was assigned to work at a farm in Brunau, Silesia. Although he did not volunteer for this work, he soon became a forced laborer for a period of several months. During this period, he met other Poles engaged in involuntary farm labor for the Germans. In July 1940 he and a friend escaped by train to Frankfurt where they were apprehended on the street by a German policeman who noticed that they were not wearing an initial "P" which denoted "Pole." Following their arrest, they were taken to Straftlager, Germany, for forced labor and remained there for 3 months and then were returned to the same Silesian farm as forced laborers. Mr. Kozlowski and his friend then attempted a second escape and, after being arrested, they were eventually taken to Gross-Rosen, along with many other prisoners.

Mr. Kozlowski gave similar testimony as to the arrival of prisoners at Gross-Rosen. He was dressed in a white uniform with blue stripes with a red triangle upside-down in which there was a letter "P," indicating that he was a Polish political prisoner. He was assigned to labor in forced diggings and carrying of pipes and other

equipment in the Canal Construction commando until he contracted an eye disease which resulted in his temporary blindness in 1943. He was transferred by train in the summer of 1943 from Gross-Rosen to Buchenwald concentration camp, where he remained until the end of the war. His testimony as to the hangings, beatings, and other abuses at Gross-Rosen was similar to that of the previous witnesses. He also testified as to mass executions of Russian prisoners of war at Gross-Rosen by the SS during April 1943. Mr. Kozlowski testified that the treatment of prisoners at Gross-Rosen was so harsh and cruel that when he and the other transferees arrived at Buchenwald concentration camp in the summer of 1943, they called it "Canada" by comparison.

The final Government eyewitness at the respondent's hearing was Marion Wojciechowski who was born in Poland in 1914, arrived in the United States in 1950, and became a United States citizen in 1957. Prior to WWII, he attended a Polish military academy and had received an army officer's commission in 1938. During the Nazi invasion of Poland in 1939, he was wounded in action against German forces. Following Poland's surrender, he worked as an agricultural inspector. He also participated in the underground activities of the Polish resistance movement until he was arrested on April 24, 1942. He was jailed at Radom with 20 other political prisoners, all of whom were Poles and ethnic Germans. In July 1942 he was brought to the Auschwitz concentration camp, where he was engaged in slave labor. He remained at Auschwitz until March 1943, when he was taken to Gross-Rosen concentration camp together with over 1,000 other prisoners, most of them Polish. His testimony as to the arrival, procedures, uniforms, and abuses of prisoners at Gross-Rosen was similar to that given by the other witnesses.

## THE RESPONDENT'S TESTIMONY

The respondent testified that in June 1940, at the age of 19, he joined the Waffen SS with a government promise that upon completion of his enlistment he would obtain a civil service job or a farm. He was assigned to the Totenkopf Division of the Waffen SS after he received 5 weeks' combat training at Radolfzell, Germany, and at other camps.

The respondent also testified that he was wounded three times at the Eastern Front and received three military decorations. After his last injury in February 1942, he was deemed unfit for combat duty and was eventually transferred to Gross-Rosen in September 1942, where he was ordered to guard prisoners. He claims that the

guard company to which he was assigned was attached to the Gross-Rosen complex but that he was not assigned to duty within the camp itself and never served within the camp complex. The respondent testified that his first assignment was to guard the perimeter of the Gross-Rosen complex to ensure that prisoners did not escape from the area that he guarded. He was also assigned tour duty at night in the watchtowers located outside the perimeter of the protective custody area, according to his testimony. In addition, he was assigned to guard groups of prisoners forced to work outside of the Gross-Rosen concentration camp by leading them to their worksite and guarding them while they worked. This took place at the sandpits, loading area of the train station, and the quarry itself. The respondent was armed throughout the time he guarded these prisoners.

In September or October of 1942 the respondent was promoted to the rank of corporal (rottenfuehrer) and was assigned to train recruits in combat training and the use of weapons, allegedly spending 75 percent of his time training recruits and 25 percent of his time on guard duty. In September 1943 he was promoted to sergeant (unterscharfuehrer) and spent most of his time training recruits. He asserted that he did not know why certain persons were in the protective custody of the Gross-Rosen camp. He also denied any knowledge of what went on inside the protective custody area of the camp and denied that he himself was ever within the protective custody portion of the camp. He specifically denied that he ever saw a prisoner beaten at the Gross-Rosen complex and denied that he ever saw a prisoner shot or mistreated. The respondent testified that in 1943 he had personal contact with a prisoner when the prisoner was working in the SS barracks and that he brought the man a chicken when the respondent returned from leave. He testified that, as a guard, he had to follow regulations regarding the prisoners he guarded and that he always followed those regulations. He specifically denied that he ever struck, shot, killed, or even shot in the direction of a prisoner or that he ever mistreated a prisoner.

The respondent contends that he had applied for a transfer to the front during the course of his duty at Gross-Rosen and that it was denied because he was unfit for duty. However, he later denied applying for such a transfer while at Gross-Rosen.

The respondent also denied participating in the evacuation of prisoners from Gross-Rosen, despite admitting that he was on the same train as the prisoners being evacuated. He testified that he was in a separate car, did not guard prisoners, and was merely traveling to a new duty site in Austria to which he had been trans-

ferred. He stated that, during the trip from Gross-Rosen to Mauthausen, the prisoners were guarded by Ukrainians and about 50 or 60 men from his guard company. He was supposedly transferred to Austria, where he was to train a company of combat troops. He testified that he traveled in a train car with six other men, including his company commander, that the train stopped at Buchenwald, and that from Buchenwald the train went to Mauthausen. The respondent further testified that, after leaving the train station at Mauthausen, he walked to his new duty station at Au An Der Donau, which was 8 kilometers away. His only contact with a prisoner throughout the train journey was to offer prisoners some water.

## FINDING OF DEPORTABILITY UNDER SECTION 241(a)(19)

After reviewing the extensive record before us, we agree with the immigration judge that it reflects clear, unequivocal, and convincing evidence of the respondent's deportability under section 241(a)(19) of the Act, as required by *Woodby* v. *INS, supra,* and 8 C.F.R. § 242.14(a) (1984). Section 241(a)(19) provides for the deportation of aliens who

during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with—

(A) the Nazi government of Germany,

(B) any government in any area occupied by the military forces of the Nazi government of Germany,

(C) any government established with the assistance or cooperation of the Nazi government of Germany, or

(D) any government which was an ally of the Nazi government of Germany,

ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion.

The fact that the respondent's activities for the Nazi SS took place from 1940 to 1945 establishes that they fall within the period of time specified by section 241(a)(19) of the Act. Therefore, the elements of that section which are at issue are whether the respondent: (1) "assisted, or otherwise participated in the persecution of any person," (2) "because of race, religion, . . . or political opinion," (3) "under the direction of, or in association with the Nazi government of Germany."

(1) *"Assisted or otherwise participated in the persecution of any person."*

The term "persecution" as used in section 241(a)(19) of the Act contemplates the infliction of suffering or harm, under government sanction, upon persons who differ from others in the ways specified by the Act, *i.e.*, race, religion, national origin, or political opinion. *Matter of Fedorenko*, 19 I&N Dec. 57 (BIA 1984); *Matter of Laipenieks*, 18 I&N Dec. 433 (BIA 1983), *rev'd on other grounds, Laipenieks v. INS*, 750 F.2d 1427 (9th Cir. 1985). The harm or suffering inflicted may take various forms, but it most certainly includes physical confinement. *Matter of Fedorenko, supra; Matter of Laipenieks, supra.* The evidence presented clearly establishes that thousands of persons were confined at the Gross-Rosen concentration camp while the respondent served there. Most of those imprisoned were political prisoners, Jehovah's Witnesses, Protestant and Catholic clergy, Jews, and other opponents of the Nazi regime. The imprisonment of these inmates at the Gross-Rosen concentration camp clearly constituted "persecution" of them within the meaning of section 241(a)(19). *Matter of Fedorenko, supra; Matter of Laipenieks, supra.*

The respondent argues that the persecution element of section 241(a)(19) of the Act was not sufficiently established because there was no specific evidence of persecution by the respondent against the prisoners at Gross-Rosen or that, as a prison guard, he engaged in acts of brutality against them. We reject this claim.

The witnesses related many examples of the physical abuse and the poor and oppressive living conditions at the Gross-Rosen concentration camp during the time the respondent served there. The immigration judge found the testimony of the witnesses to be credible and found the respondent's own testimony to lack credibility. An immigration judge's findings regarding the credibility of witnesses is ordinarily given significant deference since he is best able to observe their demeanor. *Matter of Boromand*, 17 I&N Dec. 450 (BIA 1980); *Matter of Teng*, 15 I&N Dec. 516 (BIA 1975); *Matter of S-*, 8 I&N Dec. 574 (BIA 1960); *Matter of T-*, 7 I&N Dec. 417 (BIA 1957). Because he is in the best position to determine the accuracy, reliability, and truthfulness of the testimony he hears, the immigration judge's factual findings ordinarily will not be disturbed. *Vasquez-Mondragon v. INS*, 560 F.2d 1225, 1226 (5th Cir. 1977); *Kokkinis v. District Director*, 429 F.2d 938 (2d Cir. 1970); *Espinoza Ojeda v. INS*, 419 F.2d 183 (9th Cir. 1969); *Volianitis v. INS*, 352 F.2d 766 (9th Cir. 1965); *Hamadeh v. INS*, 343 F.2d 530 (7th Cir.), *cert. denied*, 382 U.S. 838 (1965); *Matter of Boromand, supra; Matter*

*of Teng, supra; Matter of S-, supra; Matter of T-, supra.* Here, the immigration judge found the respondent's testimony to lack credibility. After a careful review of this record, we find no reason to disturb the immigration judge's findings. The respondent cannot escape responsibility for the actions of the SS guards at the Gross-Rosen concentration camp by claiming that he did not know what was going on at Gross-Rosen. Deportability under section 241(a)(19) of the Act does not require specific evidence that the respondent engaged in acts of brutality against the prisoners. Section 241(a)(19) makes an alien deportable if he merely "assisted" in the persecution of others. Based on the testimony of the Government's witnesses, which the immigration judge found credible, the record clearly establishes that persecution was systematic and ongoing at Gross-Rosen and that the respondent was aware of it.

Similarly, the respondent's deportability under section 241(a)(19) of the Act is not defeated by his contention that his service at the camp was involuntary because he was denied a transfer from Gross-Rosen and that he merely obeyed orders. *Matter of Fedorenko, supra.* Congress intended that all who assisted the Nazis in persecuting others must be deported regardless of the degree of voluntariness of such assistance. We have already held that the actions of a Ukrainian prisoner of war who was forced by the Nazis to guard the perimeter of a concentration camp constituted assistance in persecution within the meaning of section 241(a)(19) of the Act because his actions would have aided the Nazis in their confinement of the prisoners at the camp. *Id.* Thus, it is not determinative whether the respondent himself committed acts of brutality against the prisoners. It is also well settled that involuntary confinement alone, if based solely on race, religion, or political opinion, constitutes persecution. *See Blazina v. Bouchard*, 286 F.2d 507 (3d Cir. 1961). Therefore, the respondent's duty as a perimeter guard to prevent prisoners escaping from their slave labor at Gross-Rosen is sufficient to establish his assistance to the Nazi regime's persecution of these prisoners. *Fedorenko v. United States*, 449 U.S. 490 (1981); *Matter of Fedorenko, supra.* The respondent's involvement in supervising and training prison guards at the Gross-Rosen concentration camp also clearly constituted assistance in persecution within the meaning of section 241(a)(19) of the Act because his actions would have significantly aided the Nazis in their confinement of the prisoners at the camp. Therefore, we do not need to reach the additional allegation that the respondent assisted in the persecution of the Gross-Rosen prisoners while they were evacuated to the Mauthausen concentration camp in January 1945.

(2) *Persecution "because of race, religion, . . . or political opinion."*

The evidence presented clearly establishes that many Jews, Catholics, Jehovah's Witnesses, and political prisoners were confined at the Gross-Rosen concentration camp. The record further reflects that the Gross-Rosen prisoners were classified on the basis of their religious or political beliefs, and that these classes of prisoners were abused and treated much worse than the common criminals incarcerated there. The absence of evidence that the respondent had either religious or political motivations for his actions does not alter the fact that he "assisted" in physical persecution which occurred "because of" official policies directed against people of the Jewish race and religion, of other religions, and of different political beliefs. *Matter of Fedorenko, supra; Matter of Laipenieks, supra.*

We reject the respondent's contention that Gross-Rosen contained mainly criminal prisoners and that, therefore, his duties there were akin to those of a prison guard. The evidence clearly establishes that the majority of those incarcerated were political, racial, or religious prisoners, and that in fact, criminals were the preferred class of prisoners at Gross-Rosen. Moreover, the respondent admits that his prior duties in the Totenkopf Division of the Waffen SS in occupied Russia and France were not of a military nature.[3] Rather, they related to Nazi security measures against the enemies of the Third Reich. These past security duties were consistent with the persecutive nature of his latter duties as a concentration camp guard and guard leader at Gross-Rosen. It was, in fact, the policy of the Totenkopf Division to regularly rotate personnel from the front to the concentration camps. We find that the respondent's guard duties at Gross-Rosen clearly constituted assistance in persecution "because of race, religion, . . . or political opinion."

The respondent's reliance on *Laipenieks v. INS, supra,* and the findings at *The Nurnberg Trial,* 6 F.R.D. 69 (1946), for his contention that he did not engage in persecution is misplaced. Nothing in these decisions compels a different result. The respondent volunteered for the Totenkopf Division of the SS, whose primary purpose had been the management of the SS concentration camp system. The Totenkopf committed many wartime atrocities, even while distinguishing itself for its fighting capabilities in WWII. The respond-

---

[3] The respondent joined the Totenkopf Division of the Waffen SS on June 20, 1940, when the Waffen SS was relatively select, prior to its absorption of the Baltic legions and other non-German military units during the latter stages of WWII.

ent's military career in the Totenkopf, as detailed above, primarily consisted of being a guard and training the guards who made the brutal Nazi concentration camp system achieve its goals. The fact that Gross-Rosen's primary role was the exploitation of the able-bodied victims of Nazi persecution, instead of the immediate extermination of its weaker victims, as was the function of the camp at Treblinka, did not change its persecutive nature. The Nurnberg court specifically found the slave labor policies by Nazi occupation forces to be war crimes. *The Nurnberg Trial, supra,* at 123-26, 143. We specifically hold that Waffen SS personnel who actively participated in the management of Nazi concentration camps thereby engaged in persecution as defined in section 241(a)(19) of the Act.

### (3) "Under the direction of, or in association with the Nazi government of Germany."

The evidence presented also establishes that, as a concentration camp guard, guard leader, and guard trainer, the respondent served in the Nazi SS. Thus, these findings clearly demonstrate that his activities at the Gross-Rosen concentration camp were "under the direction of, or in association with" the Nazi government of Germany. *Matter of Fedorenko, supra.*

Accordingly, the facts discussed above show by clear, unequivocal, and convincing evidence that from 1940 to 1945, under the direction of, or in association with, the Nazi government of Germany, the respondent assisted in the persecution of persons because of their race, religion, or political opinion. Therefore, the immigration judge correctly found the respondent deportable pursuant to section 241(a)(19) of the Act.

### CONSTITUTIONAL CONTENTIONS

The respondent argues that he may not be found deportable pursuant to section 241(a)(19) because it is an unconstitutional ex post facto law or bill of attainder. This argument lacks any merit whatsoever. *See Artukovic v. INS,* 693 F.2d 894 (9th Cir. 1982). It is well settled that the creation of a retroactive ground for deportation does not violate the ex post facto laws prohibition. *Marcello v. Bonds,* 349 U.S. 302, 314 (1955); *Galvan v. Press,* 347 U.S. 522, 531 (1954); *Harisiades v. Shaughnessy,* 342 U.S. 580, 594 (1952). That prohibition applies only to criminal statutes, and deportation laws are civil, not criminal, in nature. *Marcello v. Bonds, supra; Galvan v. Press, supra; Harisiades v. Shaughnessy, supra.* Moreover, the courts have rejected the argument that a deportation provision is

an unconstitutional bill of attainder. *See, e.g., MacKay v. McAlexander*, 268 F.2d 35 (9th Cir. 1959), *cert. denied*, 362 U.S. 961 (1960); *Quattrone v. Nicolls*, 210 F.2d 513, 519 (1st Cir.), *cert. denied*, 347 U.S. 976 (1954). The constitutional prohibition against bills of attainder was intended to prevent legislative punishment and trial by legislature. *United States v. Brown*, 381 U.S. 437, 442-44 (1965). This is clearly not the effect of section 241(a)(19) of the Act, as deportation is not a form of punishment, *see Harisiades v. Shaughnessy, supra*, at 594, and section 241(a)(19) does not deprive an alien of his right to a full evidentiary hearing on the issue of his deportability, with the right to judicial review. *See* sections 106(a) and 242(b) of the Act, 8 U.S.C. §§ 1106(a) and 1252(b) (1982).

We have recognized that there are harsh consequences for aliens who once assisted in Nazi persecution and now claim that their assistance was involuntary. *See Matter of Fedorenko, supra*, at 69-70. However, it is clear from the legislative history of section 241(a)(19) that Congress intended such consequences. *See* H.R. Rep. No. 1452, 95th Cong., 2d Sess. 3, *reprinted in* 1978 U.S. Code Cong. & Ad. News 4700, 4702-05. We also reject the respondent's contention that he was unfairly denied discovery in his deportation hearing. *See Marroquin-Manriquez v. INS*, 699 F.2d 129 (3d Cir. 1983); *Quattrone v. Nicholls, supra*. The respondent had full knowledge of the evidence used against him. In view of the many continuances in order to allow the respondent to prepare his case, the respondent's contention that he was not allowed sufficient time to prepare for cross-examination is not convincing.

## ADDITIONAL GROUNDS OF DEPORTABILITY

We also conclude that the record sufficiently establishes the additional charges of deportability that the respondent entered the United States by fraud and with an invalid immigrant visa. The respondent admitted that he misrepresented his wartime military service to immigration authorities by claiming to have served in the German Army (Wehrmacht) instead of the Totenkopf Division of the Waffen SS, thus concealing his concentration camp guard duty. This misrepresentation was clearly material and rendered the respondent excludable at entry under section 212(a)(19) of the Act. *See Matter of S- and B-C-*, 9 I&N Dec. 436 (BIA 1960; A.G. 1961); *cf Suite v. INS*, 594 F.2d 972 (3d Cir. 1979). He specifically admits that he concealed his wartime activities in order to obtain an immigrant visa to enter the United States. Such an admission also renders the respondent excludable at entry under section 212(a)(20) of the Act for lack of a valid immigrant visa. *United*

*States ex rel. Fink* v. *Reimer*, 96 F.2d 217 (2d Cir.), *cert. denied*, 305 U.S. 618 (1938); *Matter of Agustin*, 17 I&N Dec. 14 (BIA 1979); *Matter of Da Lomba*, 16 I&N Dec. 616 (BIA 1978). The immigration judge's decision will be modified to include these additional findings of deportability. Inasmuch as we do not find it necessary to determine the respondent's deportability under section 241(a)(2) of the Act, we decline to comment on these charges.

## RESPONDENT'S ELIGIBILITY FOR RELIEF FROM DEPORTATION

The respondent has argued that the immigration judge erred in finding him ineligible for relief from deportation under sections 241(f) and 244 (a) and (e) of the Act, 8 U.S.C. §§ 1251(f) and 1254(a) and (e) (1982). Relief afforded under each of these provisions is unavailable to an alien who is deportable pursuant to section 241(a)(19) of the Act. *See* sections 241(f)(1)(A), 244 (a) and (e) of the Act; *see also Matter of Fedorenko supra; Matter of Laipenieks, supra.* Since the respondent is deportable pursuant to section 241(a)(19) of the Act, he is precluded as a matter of law from obtaining the relief sought, and the immigration judge correctly denied the respondent's applications.

**ORDER:** The appeal is dismissed.