# In re O-D-, Respondent

*Decided January 8, 1998*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

Presentation by an asylum applicant of an identification document that is found to be counterfeit by forensic experts not only discredits the applicant's claim as to the critical elements of identity and nationality, but, in the absence of an explanation or rebuttal, also indicates an overall lack of credibility regarding the entire claim.

FOR RESPONDENT: Ronald S. Salomon, Esquire, New York, NY

BEFORE: Board En Banc: VACCA, HEILMAN, HURWITZ, FILPPU, COLE, and MATHON, Board Members. Concurring Opinion: VILLAGELIU, Board Member. Concurring and Dissenting Opinion: HOLMES, Board Member, joined by DUNNE, Vice Chairman. Dissenting Opinion: ROSENBERG, Board Member, joined by SCHMIDT, Chairman, and GUENDELSBERGER, Board Member.

HURWITZ, Board Member:

In a decision dated August 5, 1996, the Immigration Judge found the respondent deportable under section 241(a)(1)(B) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(1)(B) (1994), denied his applications for asylum and withholding of deportation under sections 208 and 243(h), 8 U.S.C. §§ 1158 and 1253(h) (1994), and granted him voluntary departure. The respondent has appealed from the denial of asylum and withholding of deportation. The appeal will be dismissed.

## I. BACKGROUND

The respondent claims to be a male native and citizen of Mauritania. In support of this claim, he proffered documents purporting to be an identity card and a birth extract from the Republic of Mauritania. Regarding the respondent's documents, the Immigration and Naturalization Service submitted into evidence a report from its Forensics Document Laboratory stating that the respondent's identity card is a "known counterfeit" and the birth certificate is "probably counterfeit." The respondent's attorney characterized the report as "conclusory" and questioned its efficacy, absent an opportunity for the parties to examine the documents that the respondent had originally

submitted to the Service. The Service responded that such documents had been returned to the respondent. Notations on the report indicate that the documents were returned to respondent's counsel by Federal Express on December 7, 1995. It appears from the record that respondent's counsel was unaware of the whereabouts of the documents. The record does not contain testimony regarding these two documents.

In his August 14, 1995, Application for Asylum and for Withholding of Deportation (Form I-589), the respondent stated that, during the course of an alleged detention, he was "subjected to beatings, torture and forced labor." His testimony at the deportation hearing made no reference to torture. Additionally, in contrast to the Form I-589, the respondent expressly testified during both direct and cross-examinations that he was beaten on only one occasion. However, the respondent did state at the hearing that soldiers arrested him, along with "a lot of young people from [his] village," and compelled him to perform hard labor.

The respondent represented that after 4 years, the soldiers released him from detention and ordered him to leave Mauritania. He stated that he went to a refugee camp in Senegal. According to the respondent, he was provided with an identification document at the camp. However, he stated that he lost such card.

The respondent was the only witness at the hearing. The documents of record include an alleged identification card and a translation thereof, a copy of the respondent's alleged birth extract and a translation thereof, a report from the Service's Forensic Document Laboratory, copies of the respondent's Forms I-589, a number of treatises regarding country conditions in Mauritania, and the Department of State's country conditions profile, *see* Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *Mauritania-Profile of Asylum Claims & Country Conditions* (July 1995) [hereinafter *Profile*].

## II. ANALYSIS

### A. Asylum and Withholding of Deportation Law Generally

In adjudicating asylum applications, we take into account our affirmative "obligations under international law to extend refuge to those who qualify for such relief." *Matter of S-M-J-*, 21 I&N Dec. 722, 723 (BIA 1997) (citing United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150). Nevertheless, such obligations do not excuse a respondent seeking asylum in the United States from meeting his burden "of establishing that he or she meets the 'refugee' definition of section 101(a)(42)(A) of the Act." *Matter of S-P-*, 21 I&N Dec. 486, 489 (BIA 1997). In order to demonstrate eligibility for asylum under section 208 of the Act, a respondent must meet this burden by demonstrating that he has suffered past persecution or he has a well-founded fear of future persecution. *See INS v.*

*Cardoza-Fonseca*, 480 U.S. 421 (1987); *Matter of Chen*, 20 I&N Dec. 16 (BIA 1989).

It is well established that we attach significant weight to the credibility of an asylum applicant. A respondent's consistent and detailed testimony can be sufficient to meet the burden of establishing persecution. *Matter of S-M-J-, supra; Matter of Kasinga,* 21 I&N Dec. 357 (BIA 1996); *Matter of B-,* 21 I&N Dec. 66 (BIA 1995); *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987). However, given the allocation of the burden of proof, a respondent must provide evidence supportive of his claim, when available, or explain its unavailability. *Matter of S-M-J-, supra; Matter of Dass*, 20 I&N Dec. 120 (BIA 1989).

## B. Respondent's Credibility

### 1. The Alleged Identity Card and Birth Certificate

At the threshold, we consider the respondent's credibility in the context of his request for asylum. Underlying the entire record is the respondent's fundamental claim that he is a citizen and national of Mauritania and seeks refuge therefrom. A concomitant to such claim is the burden of establishing identity, nationality, and citizenship. To inform our deliberations regarding the respondent's credibility vis-à-vis his fundamental claim, we juxtapose his testimony or lack thereof and the documentary evidence or lack thereof. *Matter of S-M-J-, supra; Matter of Dass, supra*. We address the identification documents proffered by the respondent in the context of the hearing and the Service's adverse forensics report regarding such documents.

First, however, we define the scope of our inquiry. We distinguish between the use of a fraudulent document: (1) in this context, i.e., the presentation of a fraudulent document in Immigration Court for the purpose of applying for asylum and (2) in other immigration-related contexts, i.e., the presentation of a fraudulent document for the purpose of escaping immediate danger from an alien's country of origin or resettlement, or for the purpose of gaining entry into the United States. *See, e.g., Matter of Pula*, 19 I&N Dec. 467, 474 (BIA 1987) ("The use of fraudulent documents to escape the country of persecution itself is not a significant adverse factor . . . ."); *see also, e.g., Matter of Y-G-,* 20 I&N Dec. 794, 796 (BIA 1994) (stating that "fraud or willful misrepresentation of a material fact in the procurement or attempted procurement of a visa, or other documentation, must be made to an authorized official of the United States Government in order for excludability under section 212(a)(6)(C)(i) of the Act to be found"). It is not our intent herein to modify or even address the developed jurisprudence regarding the latter situations. Rather, we determine only the appropriate weight to assign to a fraudulent document entered into evidence during the course of an asylum hearing, occurring in the United States, distant both in place and time from the alleged persecution.

In her decision, the Immigration Judge states that the respondent's submission into evidence of at least one counterfeit document generally discredits his testimony regarding asylum eligibility and specifically discredits his claim of identity. We agree. We focus on the significance of the "counterfeit" identity card and "probably counterfeit" birth certificate in the context of the respondent's claim as to particular vulnerability to persecution in a particular country. We draw adverse inferences from the respondent's apparent attempt to establish identity and nationality via flawed and missing documents. We also draw adverse inferences from the respondent's failure to refute or explain the negative conclusions of the forensics report.

## 2. Circuit Court Law

We find instructive a decision of the United States Court of Appeals for the Ninth Circuit which upheld the Board's adverse credibility finding in an asylum case. *Ceballos-Castillo v. INS*, 904 F.2d 519, 520 (9th Cir. 1990). The court found that the alien lacked credibility because, inter alia, he had made inconsistent statements on his Form I-589 and at the hearing regarding the identity of his alleged persecutors. The court held that such misstatements involved "the heart of the asylum claim" and therefore supported an adverse credibility finding. *Id.* at 520; *accord Leon-Barrios v. INS*, 116 F.3d 391, 393-94 (9th Cir. 1997) (upholding the Board's adverse credibility finding where identified discrepancies "are not minor" but instead "relate to the basis for [the] alleged fear of persecution"). In so finding the Ninth Circuit distinguished material misstatements from "incidental" ones, such as those at issue in *Turcios v. INS*, 821 F.2d 1396 (9th Cir. 1987). *Ceballos-Castillo v. INS, supra,* at 520.

We conclude that the misrepresentation at issue in the case at bar is analogous to the material inconsistency in *Ceballos-Castillo*. We find that the respondent's fraud pertains to a central element of his asylum claim, i.e., his identity, perhaps the most critical of elements, and thereby significantly undermines the credibility of his request for asylum.

We also find guidance in a case from the Second Circuit, the jurisdiction in which this case arises. *United States v. Strother*, 49 F.3d 869 (2d Cir. 1995)**.** In *Strother*, the court addressed a similar evidentiary issue in a criminal case involving alleged bank fraud. The court approved the following federal district court jury instruction which the appellant-defendant had challenged on appeal:

> When the defendant voluntarily and intentionally offers an explanation . . . intending to show his innocence . . . [that] is later shown to be false, you may consider whether that evidence points to a consciousness of guilt. **Ordinarily, it is reasonable to infer that an innocent person does not usually find it necessary to invent or fabricate an explanation or statement tending to establish his or her innocence.**

> On the other hand, there may be reasons, fully consistent with innocence, that will cause a person to give a false statement showing their innocence.

*Id.* at 877 (bold in original).

Similarly, in the context of an asylum adjudication, there may be instances in which a respondent voluntarily and intentionally submits a document into evidence, intending to establish his eligibility for asylum, that is later shown to be counterfeit. The adjudicator may consider whether that document points to a respondent's lack of credibility regarding the asylum claim. Ordinarily, it is reasonable to infer that a respondent with a legitimate claim does not usually find it necessary to invent or fabricate documents in order to establish asylum eligibility. On the other hand, there may be reasons, fully consistent with the claim of asylum, that will cause a person to possess false documents, such as the creation and use of a false document to escape persecution by facilitating travel.

We find that this respondent's presentation of at least one counterfeit document, and probably two, submitted to prove a central element of the claim in an asylum adjudication, indicates his lack of credibility. We also find that the presentation of such questionable documents, in the absence of an explanation regarding such presentation, creates serious doubts regarding the respondent's overall credibility. *See also United States v. Williams*, 986 F.2d 86, 89 (4th Cir.) ("[The defendant's] possession and use of false identification to cash stolen checks certainly are probative of his truthfulness and credibility as a witness . . . ."), *cert. denied*, 509 U.S. 911 (1993).

The presentation of fraudulent documents is a critical factor in our analysis of the respondent's claim. Such fraud tarnishes the respondent's veracity and diminishes the reliability of his other evidence. Our conclusion that the respondent fails to demonstrate that he is credible and fails to meet his burden of proof is in great measure based on his fundamentally flawed evidence, i.e., a known counterfeit identity document and another probably counterfeit document.

### 3. The Forensics Report

In reference to the preliminary dispute at the hearing regarding the forensics report of record, we reject the unsubstantiated argument of the respondent's counsel regarding the unreliability of such report. The record contains no testimonial or documentary evidence about the report. We also dismiss counsel's argument that his client is, in effect, prejudiced by the unavailability of the pertinent documents, in light of the fact that such documents were shown to be in his control at the time of hearing.[1]

### 4. Other Considerations and Conclusion

In our credibility deliberations, we are not limited to consideration of the respondent's identity and birth documents and the forensics report. We also

---

[1] We also note that the Department of State indicates that there is a problem of reliance on fraudulent documents by applicants, who are actually nationals of Senegal, applying for asylum from Mauritania. *Profile, supra*, at 6.

take into account the inconsistencies between the respondent's second Form I-589 and his testimony regarding his alleged torture and beatings. Additionally, in accord with our own jurisprudence, we give deference to the Immigration Judge's adverse credibility finding. *See, e.g., Matter of Burbano,* 20 I&N Dec. 872, 874 (BIA 1994) ("[W]e recognize that the immigration judge who presides over a case has certain observational advantages due to his or her presence at the exclusion or deportation hearing. . . . [T]he Board ordinarily gives significant weight to the determinations of the immigration judge regarding the credibility of witnesses at the hearing."); *see also Matter of Kulle*, 19 I&N Dec. 318 (BIA 1985), *aff'd*, 825 F.2d 1188 (7th Cir. 1987), *cert. denied*, 484 U.S. 1042 (1988).

We have considered: (1) the respondent's tainted documents and their centrality to his application for asylum; (2) the inconsistencies between the respondent's Form I-589 and his testimony; and (3) the Immigration Judge's adverse credibility finding. We conclude that the respondent is not credible. We find that the respondent compromised the integrity of his entire claim by submitting at least one fraudulent document vis-à-vis a germane aspect of such claim and by failing to explain his fraud. *See generally Matter of S-M-J-, supra*, at 724 (finding that a respondent must explain a failure to provide certain evidence); *Matter of Dass, supra*. Moreover, we find that the remaining inconsistent record presented by the respondent is insufficient to overcome the pall cast on the respondent's credibility by virtue of his submission of the counterfeit document.

Regarding the respondent's alleged Mauritanian nationality and citizenship, we note that the respondent premises his appeal, in part, on statements in the Immigration Judge's decision which appear to acknowledge such nationality and citizenship. We disagree with such statements of the Immigration Judge. In any event, the essential element of a deportability finding is alienage and not a particular nationality or citizenship. In light of the respondent's presentation of at least one counterfeit document of identification and our conclusion that the respondent is not credible, we find that he has not demonstrated Mauritanian citizenship or nationality, and we reject the respondent's reliance on the Immigration Judge's nonprejudicial statement to the contrary.

## C. Asylum and Withholding of Deportation Law Applied

We have herein made an adverse credibility finding based, in great measure, on the tainted and inconsistent record presented by the respondent. We conclude that he has not met his burden of proof because he failed to establish his identity, his nationality, his citizenship, and the other particulars of his claim. In light of our credibility finding and our conclusion regarding the burden of proof, we find that the respondent failed to establish that he has suffered past persecution or reasonably fears future persecution in Mauritania.

Inasmuch as the respondent has failed to satisfy the lower burden of proof required for asylum, it follows that he has also failed to satisfy the clear probability standard of eligibility required for withholding of deportation. *See Matter of Mogharrabi, supra.* The evidence does not establish that it is more likely than not that the respondent would be subject to persecution as specified in section 243(h) of the Act. *See INS v. Stevic*, 467 U.S. 407 (1984). Accordingly, the appeal will be dismissed.

**ORDER:** The appeal is dismissed.

**FURTHER ORDER:** Pursuant to the Immigration Judge's order and in accordance with our decision in *Matter of Chouliaris,* 16 I&N Dec. 168 (BIA 1977), the respondent is permitted to depart from the United States voluntarily within 30 days from the date of this order or any extension beyond that time as may be granted by the district director; and in the event of failure so to depart, the respondent shall be deported pursuant to the mandates of section 243(a) of the Act, 8 U.S.C. § 1253(a) (1994).

*CONCURRING OPINION:* Gustavo D. Villageliu, Board Member

I respectfully concur.

While I agree with the entirety of the majority's opinion, I write separately to briefly address issues raised by the dissenting opinions in this case.

The dissenting opinion disagrees with our giving deference to the Immigration Judge's adverse credibility finding in this case. This finding was partially based on the respondent's submission of a Mauritanian identity card as proof of his persecution claim as a Fulani tribe activist, arrested and abused by Mauritanian soldiers. The identity card was determined to be fraudulent by the Forensics Document Laboratory of the Immigration and Naturalization Service, which also reported that the respondent's Mauritanian birth certificate was probably counterfeit. The concurring and dissenting opinion, instead, disagrees with the dissent's casual dismissal of the significance of submitting such counterfeit documentation as proof without adequate explanation. However, it asserts that a remand to the Immigration Judge in order to allow such an explanation would be more appropriate than dismissing the appeal in view of other perceived shortcomings in the Immigration Judge's adverse credibility determination.

The respondent's identity and nationality are crucial to his persecution claim. He testified that he was a member of the Fulani minority tribe who was accepted at a Senegal refugee camp for Mauritanian refugees after allegedly being released from a Mauritanian detention facility and expelled from Mauritania.[1] Without adequate proof of his nationality and tribe membership his

---

[1] According to the Committees on Foreign Relations and International Relations, 105th Cong., 1st Sess., *Country Reports on Human Rights Practices for 1996* 173 (Joint Comm. Print 1997), approximately half of the Mauritanian refugees in Senegal have returned to Mauritania

claim would fail. The majority opinion also lists several inconsistencies between the respondent's Application for Asylum and for Withholding of Deportation (Form I-589) and his testimony, and draws adverse inferences from the respondent's failure to refute or even address the conclusions of the forensic report. Therefore, it affirms the Immigration Judge's finding that the respondent failed to meet his burden of proof.

The respondent's Notice of Appeal (Form EOIR-26) merely states that the Immigration Judge had designated Mauritania as the respondent's native country for purposes of deportation; claims that the respondent had submitted sufficient evidence and disavowed one of the applications for asylum which the Immigration Judge found inconsistent with his testimony; and gives one example of an allegedly incorrectly cited discrepancy by the Immigration Judge. It does not address the determination that his evidence was found to be counterfeit. It further states that a brief in support of the Notice of Appeal would be timely submitted, but no such brief was presented on appeal. Consequently, since the failure to submit such a brief without an explanation renders the respondent's appeal subject to summary dismissal pursuant to 8 C.F.R. § 3.1(d)(1-a)(E) (1997), another question before us is the level of appellate scrutiny we should accord to this appeal.

The dissent admits that an Immigration Judge's credibility finding should be given deference if supported by the record, but claims that a de novo review is the appropriate standard we should employ for our appellate review in this case. However, the authority cited by the dissent for such a de novo review specifically related to the review of discretionary determinations. *Matter of Burbano*, 20 I&N Dec. 872, 873 (BIA 1994). While we recognized in that case our power to review de novo credibility determinations where appropriate, we did not suggest that we should indiscriminately second guess every adverse credibility finding. *Id.* at 874; *cf.* Henry G. Watkins, *Credibility Findings in Deportation Proceedings "Bear(ing) Witness Unto the Truth*," 2 Geo. Immigr. L.J. 231, 259 (1987-1988). We have consistently stated that an Immigration Judge's credibility findings should be given considerable deference. *Matter of Kulle*, 19 I&N Dec. 318 (BIA 1985), *aff'd*, 825 F.2d 1188 (7th Cir. 1987), *cert. denied*, 484 U.S. 1042 (1988); *Matter of Boromand*, 17 I&N Dec. 450 (BIA 1980); *Matter of Teng*, 15 I&N Dec. 516 (BIA 1975); *Matter of S-*, 8 I&N Dec. 574 (BIA 1960); *Matter of T-*, 7 I&N Dec. 417 (BIA 1957). In asserting our delegated plenary power to review

with the assistance of the Mauritanian Red Crescent Association and the United Nations High Commission for Refugees ("UNHCR"). In addition, Senegal also provided refuge to many Liberians and other groups of refugees. The September 14, 1995, advisory opinion from the Department of State Bureau of Human Rights and Humanitarian Affairs ("BHRHA") specifically advises that ethnicity persecution claims from Afro-Mauritanians should be cautiously treated because they belong to the same ethnic group as the Senegalese themselves, and thus, the asylum applicant may actually be a Senegalese claiming to be a Mauritanian refugee.

credibility findings de novo, we have specifically stated that it has never been the usual practice of this Board to try immigration cases de novo. *Matter of B-*, 7 I&N Dec. 1, 31 (BIA 1955; A.G. 1956).

As we stated in *Matter of Dass*, 20 I&N Dec. 120 (BIA 1989), where there are significant, meaningful evidentiary gaps, asylum applications ordinarily will be denied for failure of proof. *Accord Matter of S-M-J-*, 21 I&N Dec. 722 (BIA 1997), and cases cited therein. We only decline to adopt an Immigration Judge's adverse credibility finding where the alien's testimony regarding his persecution claim is plausible, detailed, internally consistent with the asylum application, and unembellished during the applicant's repeated relating of events in probing cross-examination. *Matter of B-*, 21 I&N Dec. 66 (BIA 1995). Here, the respondent's testimony was inconsistent with his first application for asylum, and the documents he submitted to prove a crucial aspect of his persecution claim were found to be counterfeit in an unrefuted determination.

The respondent's minimal contentions on appeal provide no basis to reverse the Immigration Judge's adverse credibility finding, which has ample support in the record. Although I concur in dismissing the appeal on the merits, I would have dismissed the appeal summarily under 8 C.F.R. § 3.1(d)(1-a)(E). I also see no reason to remand the case to allow the respondent another opportunity to prove his case where he has submitted fraudulent evidence and failed to meet the appellate briefing schedule. The regulation at 8 C.F.R. § 3.1(d)(2) provides authority for this Board to remand a case, where appropriate, for further action. Such a remand for further proceedings would not be appropriate in this case.

*CONCURRING AND DISSENTING OPINION:* David B. Holmes, Board Member, in which Mary Maguire Dunne joined, Vice Chairman

I agree in part with the majority and in part with the dissent. However, I would remand this case for further proceedings and consideration, rather than dismiss or sustain the respondent's appeal on the present record. And, given the present state of the record, I would not have published the decision in this case as a precedent.

The dissent is correct that the fact that the respondent submitted a fraudulent identity card into evidence was not the central consideration in the Immigration Judge's overall assessment of the respondent's credibility and in her denial of his applications for asylum and withholding of deportation. After noting what she found to be inconsistencies between the respondent's testimony and his written submissions, the Immigration Judge went on to state that "even if I had found [the] respondent to be credible, nonetheless, I would also have to consider the fact that he has presented, in support of his application, an identity document . . . which the forensics lab has indicated is a known counterfeit. This also would tend to discredit the testimony of this

respondent and discredit his actual [claimed] identity." The Immigration Judge further opined that, even if the respondent "had been totally credible, persuasive, and convincing," his testimony was too "skeletal in nature, in particular, regarding the period of detention that he purportedly endured in Mauritania" to meet his burden of proof.

However, except for the issues raised by the presentation of the fraudulent identity document, I agree with the dissent that the differences, to the extent that they existed at all, between the respondent's testimony and the application for asylum he submitted before the Immigration Judge were minor.[2] Moreover, if the respondent's testimony was accepted as "totally credible," I certainly would find adequate evidence to establish his eligibility for asylum, particularly considering his testimony in conjunction with the uncontested evidence of country conditions in Mauritania.

I disagree with the dissent, however, insofar as it seemingly attaches little, if any, consequence to the respondent's unexplained submission into evidence of a fraudulent identity document in conjunction with his application for asylum. The dissent notes that there "are many reasons why a Mauritanian with a valid asylum claim may be in possession of documents which prove not to be valid," but it steps past the fact that neither before the Immigration Judge nor on appeal was *any* explanation offered by this represented respondent for his submission of a fraudulent document into evidence. The dissent notes that it "might" prefer an explanation from the respondent; but, in a somewhat interesting twist, it accuses the majority of engaging in "little more than conjecture and speculation" before itself speculating as to why the documents in question may have been presented. The dissent also suggests that the represented respondent was not provided an opportunity to explain himself. But, he had the entirety of the hearing to do so. The only issue respondent's counsel raised in this regard related to the "fact" that he did not have access to the documents in question. After it was pointed out to respondent's counsel that the documents had been returned to him, no other issue was raised either below or on appeal regarding the document analyst's report, nor was any explanation offered either before the Immigration Judge or on appeal for the submission of this fraudulent document into evidence. I note that it was not incumbent on the Service to produce the senior forensic document analyst in the absence of any meaningful challenge to her written report.

---

[2] At the initial master calendar hearing, the respondent, through counsel, stated that he wished to file a new asylum application and "disavow . . . the old one." The respondent subsequently testified that he had asked somebody else to prepare his initial application, that he had not read everything that was written in the application, and that that was why he had asked his attorney to prepare a new one. No further questions were posed regarding his testimony in this regard. I also note that during the cross-examination of the respondent, the Immigration and Naturalization Service attorney intimated that the respondent's earlier statement before an asylum officer may have differed from his testimony before the Immigration Judge, but no evidence in this regard was ever offered by the Government.

I agree with the majority that when a respondent submits a fraudulent document into evidence in support of an application, it is a significant matter that—unless adequately explained—will likely raise serious concerns regarding the respondent's overall veracity and the trustworthiness of other evidence presented. There may be a satisfactory explanation why such evidence has been presented in a given case, but if such an explanation is not provided—or, as in this case, no explanation whatsoever is offered—the respondent's overall truthfulness may reasonably be brought into doubt. In this latter circumstance, where the success or failure of an application for relief is essentially dependent on the respondent's testimony alone, or on such testimony and documentary evidence of unproven reliability, these doubts in a given case may be fatal to a respondent's ability to meet his or her burden of proof. It should not need to be said that the submission into evidence of documents that prove to be fraudulent is a serious matter that demands explanation.

In this case, both the majority and the dissent focus on the issues raised by the submission of the fraudulent identity document by the respondent to a far greater extent than did the Immigration Judge. In light of this, as well as my inability to agree with the other considerations relied upon by the Immigration Judge in denying the respondent's applications for asylum and withholding, and considering that the Immigration Judge did not address the issue of identity in the context of the finding of deportability and the designation of the country of deportation, I would remand this case for further proceedings at which these issues could be further addressed and further evidence presented.

*DISSENTING OPINION:* Lory D. Rosenberg, Board Member, in which Paul W. Schmidt, Chairman, and John W. Guendelsberger, Board Member, joined

I respectfully dissent.

The issue is whether the respondent has established, by credible evidence, plausible in light of country conditions, that he has experienced past persecution or has a well-founded fear of persecution and, therefore, is eligible for asylum under section 208 of the Immigration and Nationality Act, 8 U.S.C. § 1158 (1994). *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987); *Matter of Mogharrabi,* 19 I&N Dec. 439 (BIA 1987).

As I discuss below, I believe that the respondent's testimony meets the standards enunciated in our precedent decisions, which recognize that a respondent's credible testimony often is the only available and most important evidence, and may be dispositive of his claim. *See Matter of Mogharrabi, supra.* First, I reject the majority's conclusion that, in this case, a forensics report finding an identity document submitted by the respondent to be fraudulent is fatal to his claim of persecution, where the record contains no testimony about the forensics report and no indication how the underlying

identity card that is the subject of the report contradicts the respondent's claimed identity or irreparably taints the remainder of the evidence submitted in support of his claim. Second, I disagree with the majority's conclusion that the Immigration Judge's adverse credibility finding in this case is entitled to deference, as I find it to lack support in the record.

To the contrary, the totality of the evidence, considered on the record as a whole, establishes that the respondent is a native and citizen of Mauritania who has suffered past persecution in Mauritania on account of his race, social group, and political opinion. Consequently, I conclude that, based on the totality of the evidence in the record, he has satisfied his burden of proof. *See Matter of Kasinga,* 21 I&N Dec. 357 (BIA 1996); *Matter of Burbano,* 20 I&N Dec. 872 (BIA 1994); *see also Matter of S-M-J-*, 21 I&N Dec. 722 (BIA 1997); *Matter of Dass*, 20 I&N Dec. 120 (BIA 1989).

## I. REVIEW OF DECISIONS DENYING ASYLUM

The Board is charged with exercising "such discretion and authority conferred upon the Attorney General by law as appropriate and necessary for the disposition of the case." 8 C.F.R. § 3.1(d) (1997); *see also Matter of Burbano, supra*, at 873 (holding that the Board relies upon its own independent judgment in deciding the ultimate disposition of a case). In cases involving applications for asylum, we recognize that although the burden of proof is on the respondent, the respondent is not expected to prove more than that, based on the evidence presented, he has a well-founded fear of persecution on account of a protected ground. *See* section 101(a)(43) of the Act, 8 U.S.C. § 1101(a)(43) (1994); *see also Matter of S-M-J-, supra* (holding that we do not place unreasonable demands on an asylum applicant to provide evidence corroborating his claim).

When the evidence of record, taken as a whole, supports an inference that the respondent has a well-founded fear of persecution, it is appropriate to consider whether asylum should be granted the respondent as a matter of discretion. As we have acknowledged, in circumstances giving rise to claims of persecution, documentation is hard to come by, making the respondent's testimony often the only source of both subjective and objective evidence in support of his claim. *Id.; see also Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 491 (1951) (holding that the "substantial evidence" standard has been understood to mean that the adjudicator's conclusions are expected to take into account, and reflect in his or her decision, consideration not only of those facts in the record that support the conclusion, but also of evidence in the record that detracts from it). It is critical, therefore, that we consider the entire record in reviewing an appeal and determining whether an asylum applicant has established a well-founded fear of persecution.

## II. EVIDENCE OF RECORD

In this case, the record includes the following: the Order To Show Cause ("OSC") alleging that the respondent is an alien and a national of Mauritania and charging him with being deportable; the respondent's initial and subsequent Applications for Asylum and for Withholding of Deportation (Forms I-589); a 1995 Department of State country conditions profile, Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *Mauritania-Profile of Asylum Claims & Country Conditions* (July 1995) [hereinafter *Profile*]; the transcript of hearing containing the respondent's testimony; the decision of the Immigration Judge finding the respondent deportable as alleged and charged, denying asylum and ordering him deported to Mauritania, from which the respondent has appealed; and a number of treatises regarding country conditions in Mauritania during the relevant time period. *See, e.g.,* Janet Fleischman, *Mauritania, Ethnic Cleansing*, Africa Report 45 (Jan.-Feb. 1994); Amnesty International, *Mauritania* (1993).

### A. Evidence of Mauritanian Nationality and Persecution as a Fulani (Black Mauritanian)

The Immigration Judge's decision establishes that the respondent admitted the allegations of alienage and nationality contained in the OSC. In her written application, she indicated that Mauritania is controlled by "white" moors of Arabic descent, and that since 1989, thousands of the "black" Hal Fular (Halpulaar) segment of the population, of which the respondent is a member, have been arrested, tortured, killed and expelled from their country. She indicates that "in 1989, he was detained and held for several years in a prison camp, subjected to beatings, torture and forced labor."[1]

In addition, the respondent indicates that he and his family are members of the Fulani tribe and that at the time of the persecution they suffered, they were known as or perceived to be supporters of the African Liberation Forces of Mauritania ("FLAM"), an organization notable for its outspoken protestations against the abuses of the Mauritanian Government. He indicated that his family was expelled from their home, that their land, inherited from his grandparents and great-grandparents was seized, and that they were deported to Senegal. He also states that his father, while resisting arrest under these circumstances, was beaten and killed.

As the Immigration Judge's decision acknowledges, in corroboration of his written Form I-589 application, corrected and clarified by the second Form I-589 application, the respondent testified in detail regarding his Mauritanian identity and Fulani membership, indicating that he had been a herder, that he had sold cows and given money to the FLAM at his father's behest.

---

[1] I note that it is the Immigration Judge, as well as the respondent, who characterized the respondent's detention as torture.

The respondent also described the circumstances of his arrest and detention. Specifically, the respondent testified that government soldiers descended on his village and assaulted his father with the back of a rifle. The respondent elaborated that his father resisted efforts to arrest those believed to be members of the FLAM in an effort to protect female family members from possible rape by military officers and was beaten. The respondent explained that his father eventually died in a refugee camp outside of Mauritania. The respondent himself was apprehended and placed on a truck which took him to a military camp within the country where he was imprisoned.

The respondent stated that immediately following his arrest, prisoners were segregated by gender and transported by truck to a prison, which the respondent identified by name. The respondent recalled that prison meals consisted exclusively of rice and that one meal was served each day. The respondent also recounted that during his 4-year detention, he was interrogated concerning the FLAM, beaten severely on one occasion, and compelled to perform hard labor, which included breaking rocks and manufacturing charcoal. He was able to describe the latter process in detail. He testified to being taken eventually to a riverbank and forced to swim the river to Senegal, where he arrived at a refugee camp in "Thilogne." In addition, the respondent related, with specificity, the particulars regarding his reunion with his mother and siblings at this refugee camp, including his learning at that time that his father had died as a result of the earlier beating.

The respondent's testimony is supported by the report of the Department of State's *Profile*. That report finds that the commission of human rights abuses by the National Guard and police in Mauritania have been reported. The report also states that "[t]he Government continue[s] to restrict political activity" and that "[p]rison conditions are harsh and unhealthy." *Id*. at 3. The harsh prison conditions are also noted in the Amnesty International Report. *Mauritania, supra*. The Africa Report also corroborates the respondent's recitation, both substantively and temporally. Fleischman, *supra*. Moreover, as explained below, the respondent's testimony was essentially consistent with his written applications.

## B. Evidence of Presentation of a Fraudulent Mauritanian Identity Card

The record contains a document purporting to be a Mauritanian identity card. There is a forensics report, however, indicating that the respondent's identity card is a "known counterfeit" and the birth certificate is "probably counterfeit."

## II. PROPER EXERCISE OF ADMINISTRATIVE REVIEW

The Immigration Judge concluded that the respondent lacked credibility and discredited the respondent's claim on the basis of inconsistencies she

claimed to have found between the respondent's application(s) and his testimony. Although the Board generally gives deference to an Immigration Judge's credibility finding, *see Matter of Burbano*, 20 I&N Dec. 872, 874 (BIA 1994); *Matter of Kulle*, 19 I&N Dec. 318 (BIA 1985), *aff'd*, 825 F.2d 1188 (7th Cir. 1987), *cert. denied*, 484 U.S. 1042 (1988), such deference is not absolute, and it does not mean that we surrender our authority to review the record. *Mathie v. Fries*, 121 F.3d 808, 811 (2d Cir. 1997) (citing *United States v. Rios,* 856 F.2d 493, 495 (2d Cir. 1988) (recognizing that a "trial court's credibility determinations are not completely immune from appeal")); *Matter of B-*, 7 I&N Dec. 1, 32 (BIA 1955; A.G. 1956); *see also Anderson v. Bessemer*, 470 U.S. 564 (1985) (emphasizing that a reviewing body is not compelled to defer to a trial judge's determination just because it has been denominated a credibility finding); *Cuyler v. Sullivan*, 446 U.S. 335, 342 (1980) (describing a mixed determination warranting de novo review as one that requires the application of legal principles to the historical facts of the case).

An Immigration Judge's credibility findings are entitled to deference only where they are supported by "specific, cogent reasons." *See, e.g., Hartooni v. INS*, 21 F.3d 336, 342 (9th Cir. 1994); *see also Osorio v. INS*, 99 F.3d 928, 931 (9th Cir. 1996); *Aguilera-Cota v. United States INS*, 914 F.3d 1375, 1381 (9th Cir. 1990) (citing *Turcios v. INS*, 821 F.2d 1396, 1399 (9th Cir. 1987)). As explained by the Court in *Aguilera-Cota v. United States INS, supra*:

> The fact that an IJ considers a petitioner not to be credible *constitutes the beginning not the end of our inquiry*. As we have stated, "When the Immigration Judge provides specific reasons for questioning a witness's credibility, this court may evaluate those reasons to determine whether they are valid grounds upon which to base a finding that the applicant is not credible." *Vilorio Lopez v. INS*, 852 F.2d 1137, 1142 (9th Cir. 1988).

*Id*. at 1381 (emphasis added).

The decision of the Immigration Judge notes, almost as an afterthought, that her finding that the respondent lacked credibility on account of having made inconsistent statements was supported by a forensics report indicating that the respondent submitted a fraudulent Mauritanian identity card. By contrast, the majority does not endorse the decision of the Immigration Judge as it stands, but relies principally on the forensics report, rather than the actual findings of inconsistencies in the record made by the Immigration Judge, as a basis to uphold the denial of asylum. While such de novo review is not inappropriate, and the weight to be given the evidence presented is a matter properly treated as a mixed question of law and fact, I dissent from the particular inferences drawn by the majority, as I find them to be unsupported by the record.

### 1. The Proper Basis for Evaluating Documentary Evidence

The only evidence in the record that arguably detracts from the respondent's claim is the Mauritanian identification card and birth certificate

presented by the respondent, which were called into question by a forensics report. Supplementing her credibility finding, the Immigration Judge stated in her decision, "[The counterfeit document] would tend to discredit the testimony of this respondent and discredit his actual claimed identity . . . ."

The identity card itself is, of course, a document. The forensics report opining that it is not valid but fraudulent, also is a document. I note that the Immigration and Naturalization Service's forensics expert did not testify at the hearing, nor was the respondent examined about the identification card in light of the forensics report that was provided. Under these circumstances, I reject the majority's conclusion that a forensics report finding a document submitted by the respondent to be fraudulent is fatal to his claim of persecution.

The determination of the weight to be given the document, and its bearing on the evidence in the record as a whole, is one that can be made by a reviewing authority as readily and accurately as it can be by the trier of fact. *Matter of B-, supra*; Olin Guy Wellborn III, *Demeanor*, 76 Cornell L. Rev. 1075, 1095 (July 1991). Although the majority has made such a determination based on the document, the inference drawn from their determination lacks support in the record.

As it stands, the record contains no proven *inconsistency* as to the respondent's identity as a Mauritanian national. The forensics report establishing the identity card to be fraudulent is no more than a determination that the document is a fraudulent one. Its probative value as to the veracity of the respondent's claim to be a Mauritanian national or the particulars of persecution recited in his claim has not been demonstrated. While we might prefer an explanation from the respondent concerning his use of a false document or find additional verification of his Mauritanian identity reassuring, evidence that the identity document is fraudulent does not contradict or discredit the entire remainder of the respondent's claim as to his nationality and tribal background, or his persecution in Mauritania.

As we stated in *Matter of S-M-J-*, 21 I&N Dec. 722 (BIA 1997), it is the Immigration Judge's role to "'[e]nsure that the applicant presents his case as fully as possible and with all available evidence.'" *Id*. at 10 (quoting Office of the High Commissioner on Refugees *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* para. 205(b)(i), at 49 (Geneva, 1992) ("*Handbook*")). The *Handbook* provides, further, that it is up to the asylum adjudicator (in this instance, the Immigration Judge) to attempt to "resolve any contradictions . . . and to find an explanation for any misrepresentation or concealment of material facts." *Handbook, supra*, para. 199, at 47.

The concerns expressed by the concurring and dissenting Board Members concerning the degree of discomfort we in the dissent have expressed about being able to pin down the respondent's identity through documentation,

focus not so much on the respondent's actual identity, but on why we are not troubled that he could not provide a better explanation for failing to document his existence. The answer is simple; we recognize that an asylum seeker is limited in the documentation he can provide and we also recognize the burden of proof that the law requires. We also recognize that his ability to provide identification or an explanation for providing identification that may be determined to be prepared on unofficial paper or by persons lacking the authority to prepare it, can be significantly attenuated from his claim to have experienced persecution. Before an applicant's claim itself is discredited, at the very least, he should be asked to explain such discrepancies; in the end, the claim must be judged by considering the totality of the evidence on the record as a whole.

A finding that the submission of the card indicates or supports an inference that the respondent is not Mauritanian or otherwise discredits his contentions is little more than speculation and conjecture by the Immigration Judge and the majority. It is equally possible to conclude that the respondent obtained the document for an unrelated reason or that he submitted the document for reasons corroborative of past persecution and his fear of persecution if deported to Mauritania. *See Turcios v. INS, supra*, at 1399-1400. The majority's reliance on an inference to the contrary is not supported by legal authority or reason.

The majority cites *United States v. Strother,* 49 F.3d 869 (2d Cir. 1995), for the proposition that a falsehood suggests that a case lacks merit. However, the totality of circumstances approach, which is the one we routinely invoke in asylum determinations, is expressly required by *Strother*.[2] There, the Second Circuit emphasized that the fact finder must consider such statements "'in the light of all the other evidence in the case in determining guilt or innocence.'" *Id*. at 877 (quoting lower court's jury instructions). The court recognized that "there may be reasons, fully consistent with innocence, that will cause a person to give a false statement showing . . . innocence." *Id*.

In the instant case, the issue of the respondent's nationality and the merits of his claim must also be determined in light of the totality of the evidence of record. There are many reasons why a Mauritanian with a valid asylum claim may be in possession of documents which prove not to be valid. The record below does not establish the background as to how or when the respondent obtained the disputed documents. As the Second Circuit emphasized in *United States v. Strother, supra*, prior inconsistent statements may not be used to impeach credibility unless "the witness is afforded an opportunity to deny or explain the same." *Id*. at 874.

---

[2] The *Handbook* also requires consideration of a range of circumstances and a cumulative assessment of the evidence. *Handbook, supra*, paras. 195-205, at 47-49.

## 2.  The Proper Allocation of Deference to Findings Regarding Testimonial Evidence

The principle of deference to factual findings is distinct from the standard of review. It rests on the assumption that a trier of fact who is physically present when testimony is taken and is able to observe the witness contemporaneously with hearing him testify may be in a better position to determine the force of such testimony when its characterization relies in part on the witness' demeanor.

Although the Immigration Judge has the benefit of being able to observe witnesses as they testify, her credibility determination is not entitled to automatic deference. *See generally Wellborn, supra*, at 1095 ("[T]he trial judge's access to demeanor evidence should not by itself justify deference.").

As the majority recognizes implicitly, *Matter of Burbano, supra*, does not define the standard of review we apply as being a deferential one. *Id*. at 873-74. It does, however, address the deference we ordinarily extend to specific factual findings made below. *Id*. A credibility finding typically is, at least in part, one such factual finding.

The Immigration Judge based her adverse credibility finding primarily on her determination that certain material statements in the respondent's Form I-589 and his testimony were inconsistent. At his hearing, the respondent explained that he was originally unrepresented and that, upon engaging counsel, he requested the submission of a second Form I-589 to supersede his first application. He made the request because he had not been confident of the propriety of the initial form and because his illiteracy precluded him from verifying its accuracy. These are reasonable and plausible explanations for submitting a second form at variance with the first one. Moreover, neither of the two principal examples cited by the Immigration Judge shows inconsistency between his application and his testimony.

First, the Immigration Judge was troubled by what she considered to be conflicting recitations regarding an incident involving the respondent's father. According to the Immigration Judge, the Form I-589 states that the respondent's father was beaten "by army officials while resisting *arrest*." (Emphasis added.) She noted that, by contrast, the respondent testified that his father had been beaten while defending the women of his family against soldiers' attempted sexual assaults, but made no mention of any arrest. However, the pertinent Form I-589 does not contain the word, "arrest." The actual language used in the application states, "[m]y father, *while resisting*, was beaten . . ." (emphasis added). Even if it did contain such a distinction, it would not be either inconsistent or material. The thrust of the respondent's Form I-589 and testimony are undeniably consistent.

Second, the Immigration Judge also found "somewhat contradictory" the respondent's account of his activity in the FLAM political party. However, his testimony that initially his father had forced him to join and support

FLAM does not disprove or even diminish his written claim that he and his family "were strong supporters of FLAM." In any event, the respondent stated that he became more committed to the party after an occasion when party members came to his home and educated him as to the goals of the organization and solicited his assistance. Therefore, the respondent's Form I-589 and his testimony also are consistent regarding his FLAM affiliation.

In reviewing an adverse credibility finding premised on such purported inconsistencies, we consider: 1) whether such consistencies actually are present; and 2) if they are, whether they go to the heart of the claim. In this case, the cited inconsistencies are not inconsistencies at all, but slight variances between the respondent's written application and his subsequent testimony. The variances relied on by the Immigration Judge and the majority do not undermine the heart of the respondent's claim. It makes little difference if the respondent's father was beaten resisting arrest, or beaten while attempting to protect the female members of the family, and then arrested, just as it is immaterial whether the respondent originally was not a FLAM supporter, but was believed to be one because of his family's affiliation, and later came to support the organization.

The "omission of details" from prior statements are no more significant than minor inconsistencies and do not undermine the credibility of the respondent's claim. *Osorio v. INS, supra*, at 931; *see also Matter of Fefe*, 20 I&N Dec. 116, 118 (BIA 1989). Such distinctions are the type of "'minor omissions,' 'minor inconsistencies,' and 'trivial errors'" that cannot support an adverse credibility finding. *Osorio v. INS, supra*, at 932.

The only authorities cited by the majority justifying its support of the result reached by the Immigration Judge are inapposite to the instant claim. *Ceballos-Castillo v. INS*, 904 F.2d 519 (9th Cir. 1990), involved a record containing mutually exclusive claims. The applicant in that case originally contended that he was the victim of guerilla persecution, and then, subsequently making a "'180 degree' change," claimed that he was the victim of government persecution, causing the court to conclude that the adverse credibility finding was warranted based on these "gross" inconsistencies involving "the heart of the asylum claim." *Id.* at 520. Similarly, the court in *de Leon-Barrios v. INS,* 116 F.3d 391 (9th Cir. 1997), upheld an adverse credibility finding where two applications for asylum, one describing threats and abuse suffered by the respondent and family members, and the next addressing only threats received by the respondent based on his membership in a labor organization, were starkly inconsistent.

No such "gross" inconsistencies going to the heart of the respondent's claim are present here. The Immigration Judge based her conclusion that the respondent was not credible, in primary part, on the testimony presented by the respondent and his applications for asylum, which she erroneously construed as being inconsistent. No deference is due to such findings.

## III. CONSIDERATION OF THE RESPONDENT'S ASYLUM CLAIM UNDER A TOTALITY OF THE EVIDENCE STANDARD

Neither the Immigration Judge's assessment of the respondent's testimony nor the existence in the record of the forensics report questioning the authenticity of his Mauritanian identity card is a basis for dismissing the respondent's asylum claim. The respondent's evidence is consistent with the conclusion that he is a black Mauritanian member of the Fulani tribe, who has lived in Mauritania on land handed down to his family by his grandparents and provided financial support to the FLAM. The record reflects that in 1989, he and his family were brutally and forcibly ejected from that land by the government; he was arrested, taken to jail and forced to work at hard labor for 4 years until being expelled from his own country.

While not condoning the use of fraudulent documents, I cannot agree with the apparent inferences drawn either by the Immigration Judge or by the majority concerning the respondent's credibility. *Cf. Dulane v. INS*, 46 F.3d 988, 998 (10th Cir. 1995) (finding that the Board erred in making an "implied adverse credibility finding" on the basis of conflicting evidence as to the respondent's nationality). In drawing conclusions concerning respondent's submission of the identity card without the benefit of testimony concerning the forensics report and without having elicited an explanation from the respondent, both the majority and the Immigration Judge abrogate our obligation "to bring [the] applicant's story to light, . . . to clarify any apparent inconsistencies and to resolve any contradictions . . ., and to find an explanation for any misrepresentation or concealment of material facts." *Handbook, supra,* para. 199, at 47; *see also Matter of S-M-J-, supra*.

Moreover, the *Handbook* cautions that even an untrue statement by an applicant is not by itself a reason to deny an asylum application. *Handbook, supra*, para. 199, at 47. Such evidence must be evaluated in light of all of the circumstances of the case. *Id*. para. 201, at 48 (calling for a fact-finding process that considers the "cumulative effect of the applicant's experience"). The majority's treatment of the forensics report, finding the respondent's identity card to be fraudulent, as, in effect, giving rise to a presumption that the asylum application cannot be found credible and must be denied, does not conform to paragraph 199 of the *Handbook. See Turcios v. INS, supra*, at 1399-1400 (quoting paragraph 199 of the *Handbook* and finding a false statement to immigration officers in the United States in which the respondent claimed Mexican nationality supported rather than detracted from his claim of persecution in El Salvador); *see also Ceballos-Castillo v. INS, supra*, at 520 (recognizing that untrue statements alone are not a reason for denying asylum, but distinguishing untrue statements going to the heart of the asylum seekers' claims).

Reliance on the forensics report is all the more troubling because we have found the respondent's evidence concerning the circumstances of his arrest and persecution to be consistent, and the Immigration Judge found the allegations concerning the respondent's nationality in the OSC to be true and credited his admissions and much of his other testimony substantiating his Fulani tribal membership and Mauritanian origins. She actually designated Mauritania as the country to which the respondent is to be deported should he not depart voluntarily as ordered. To effect the respondent's deportation pursuant to the Immigration Judge's alternate order, the Service would have to obtain a travel document for the respondent from the Government of Mauritania authorizing his return there. *See* section 243(a) of the Act, 8 U.S.C. § 1253(a) (1994).

Given that the Service is in a position to obtain evidence pertaining to the respondent's nationality, its submission of a forensics report leading the Immigration Judge to discredit his asylum claim, without seeking either to confirm his nationality during the course of the hearing, or if necessary, to amend the OSC, is unsettling. *Cf. Matter of Vivas*, 16 I&N Dec. 68 (BIA 1977) (holding that notwithstanding allocation of the burden of proof the party with more ready access to evidence substantiating a party's burden should come forward with it); *Matter of S-M-J-, supra*, at 726-27, 732 (recognizing the Service's role in an asylum hearing to produce any relevant evidence that would further adjudication of the claim, and its general obligation to see that justice is done).

Furthermore, I cannot agree with the majority's implicit presumption that an adverse forensics report, or even an admittedly false document, undermines the case of an otherwise meritorious asylum applicant. Such a bright-line rule ignores the exigencies faced by asylum seekers in terms of trauma, fear, and cultural and language barriers, and would defeat the principle of case-by-case consideration of an asylum claim based on the totality of the circumstances as required by the *Handbook, supra*, para. 201, at 48.

Employing a totality of the circumstances review and applying the credibility standards enunciated in our precedents, I conclude that the respondent is credible. Based on this affirmative credibility finding, I accept as true his representations that he is a citizen and national of Mauritania who was a FLAM supporter, resulting in his arrest and 4-year period of detention during which he was interrogated, compelled to perform hard labor, and, on one occasion, severely beaten. I also find plausible the respondent's statement that soldiers had told him that since he had "confirmed that [he] was involved in FLAM, [he] would not be released very early and [he would] be subject to heavy labors all the time."

The respondent's detailed and consistent testimony is corroborated by independent reports of human rights abuses by the National Guard and police, the restriction of political activity, and harsh and unhealthy prison conditions, such as those claimed by the respondent. Such corroboration of

his credible testimony concerning his treatment further establishes the objective element required to establish past persecution and a well-founded fear of persecution. *INS v. Cardoza-Fonseca, supra*.

## IV. CONCLUSION

In summary, based on my consideration of the totality of the circumstances presented, I find that the respondent has demonstrated by detailed, consistent, and plausible testimony (corroborated by probative evidence of known country conditions) that he is a national of Mauritania and a member of the Fulani tribe, who has suffered past persecution on account of his race, tribal affiliation, and imputed political opinion.

The record does not support a conclusion that the respondent is from a country other than Mauritania, or that he has failed to meet his burden of proving persecution by credible evidence. While a fraudulent identity card submitted by the respondent arguably could be shown to be relevant and probative, without more, it is not dispositive of the respondent's credibility, and does not fatally undermine his claim. It does not buttress an erroneous credibility determination made by the Immigration Judge which relies on findings of inconsistencies in the record where no such inconsistencies exist.

For the foregoing reasons, I would sustain the respondent's appeal and grant his asylum application. I therefore respectfully dissent.