

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-1-2008

# Sakho v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-2450

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Sakho v. Atty Gen USA" (2008). *2008 Decisions.* Paper 1280.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1280

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-2450
_____

BOUBOU SAKHO,
Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES
_____

Petition for Review of an Order of the
United States Department of Justice
Board of Immigration Appeals
(BIA No. A78 226 499)
Immigration Judge:  R. K. Malloy
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
April 16, 2008

Before: RENDELL, GREENBERG and VAN ANTWERPEN, Circuit Judges

(Filed May 1, 2008)
_____

OPINION OF THE COURT
_____

PER CURIAM

Boubou Sakho petitions for review of an order of the Board of Immigration

Appeals (BIA or Board), which dismissed his appeal of an Immigration Judge's (IJ's)

final removal order.  For the reasons that follow, we will deny the petition.

Boubou Sakho apparently entered the United States in 1999. He filed an asylum application in May of 2000, based on a claim that he was persecuted as a Black Mauritanian. An asylum officer referred the case to the Immigration Court, and Sakho was charged with removability for being present without having been admitted or paroled. A.R. 573. The Notice to Appear also stated that Sakho's nativity and citizenship was unknown. Id.

Following some continuances and a change in venue, a merits hearing was scheduled for June 13, 2001. Sakho submitted a birth certificate and national identity card ("First ID Card") a few days before the hearing. The IJ granted a continuance to allow Sakho to try to have the documents authenticated by the U.S. Consulate in Mauritania. A.R. 129. The IJ reminded Sakho that it was his burden to establish his identity, and noted that "if he can show that he is in fact an African Mauritanian, then very likely there would be a claim for asylum here." A.R. 129-30.

The Government sent the documents to the Forensic Document Laboratory. The Laboratory issued a report on September 10, 2001, stating that the birth certificate did not "conform to specimens on file in the INS/FDL reference library and is counterfeit." A.R. 389. The Laboratory stated that the birth certificate was produced with a photocopier or laser printer and did not match the "high quality offset printing process used in the production of genuine birth extracts." Id. The Laboratory was unable to determine the authenticity of the First ID Card "due to the lack of sophistication with which the

2

Mauritanian National Identity Cards are produced, as well as the ease of unauthorized duplication." Id. The Laboratory noted that the issuance date on the card had been altered to read "1997." Id.

The matter was transferred to another IJ, who granted several continuances to allow Sakho to try and obtain authentic documents. The IJ also suggested that Sakho could produce an expert who could testify or submit an affidavit that Sakho was of Soninke ethnicity from Mauritania. At one point, the IJ dismissed Sakho's asylum claim without prejudice, because he had informed the IJ that he planned to marry a U.S. citizen and would seek adjustment of status. A.R. 161. At a hearing on March 16, 2004, Sakho informed the IJ that he would not be seeking to adjust status based on marriage and he produced a "certificate of nationality" and a letter from the Mauritanian Embassy in Washington, D.C., stating that the certificate of nationality and his national identity card were genuine. A.R. 520. The Government initially agreed to return to Sakho the national identity card he had submitted earlier (the First ID Card) so that he could apply for a laissez-passer document (a passport valid for one trip from the United States to Mauritania); however, the Government later noticed that the identity card referenced in the letter from the Mauritanian Embassy as genuine had a different document number than the First ID Card. A.R. 514. The Government refused to release the First ID Card, because it might allow Sakho to use a fraudulent or altered document to obtain a valid document. Id.; A.R. 531.

In August 2004, Sakho's attorney noted that he had not been able to obtain the

3

laissez-passer document because Sakho did not have the money to purchase a required airline ticket back to Mauritania. A.R. 181-82. Sakho also produced the identity card referenced in the Embassy's letter ("Second ID Card"). A.R. 183. The Second ID Card, the certificate of nationality, and the Embassy's letter, were sent to the Federal Documents Laboratory for analysis. The Laboratory issued its report on April 13, 2005, stating that it could not definitively authenticate or refute the Certificate of Nationality, but did note that there were indications that it was not valid, as "[t]he letterhead, form, entries, stamp impression and signature were prepared using color inkjet printer technology." A.R. 504. The Laboratory was unable to determine whether the Embassy letter and the Second ID Card were authentic due to a lack of comparable genuine samples on file.[1] Id.

Proceeding with new counsel, Sakho finally had a merits hearing on June 27, 2005. At the hearing, he testified that on June 15, 1989 around 3:00 a.m., some military men came and broke into his family's home. Upon request, his father produced the family's identification papers. The soldiers did not return the papers. They beat up Sakho's father, breaking his legs. They tied the family together and put them in a military vehicle. A.R. 196. They took the family to a jail about 18 kilometers away, where the family was abused and mistreated. After about a week, they took the family to a river bank and told them to cross into Senegal. The family had no papers or possessions. They went to a

_____

[1] The Government attempted to have the Mauritanian Embassy acknowledge that the letter was authentic, but it failed to respond. A.R. 215-16, 270.

refugee camp in Senegal. A.R. 196-97. Sakho left the camp in September 1994 and went to Dakar to find work. A.R. 197. He worked at the port, and eventually a friend arranged his passage on a boat to the United States on June 10, 1999. Id. The boat arrived in the United States, at Baltimore, on July 4, 1999. A friend gave Sakho a bus ticket to New York, and told him to find someone African to help him there. Sakho located an African taxi driver who took him to a mosque. A.R. 198-99. Sakho remained in New York until he moved to Philadelphia in 2001 or 2002. Id.

The Government pointed out that the affidavit Sakho submitted with his asylum application stated "we were coming from our farm and just happened on this ugly scene" of his father being beaten by the military men, A.R. 220-21, 487; but that his testimony indicated that the incident occurred at 3:00 a.m., when he was home. A.R. 220. Sakho explained that perhaps the person who helped him fill out the asylum application did not understand what he was saying. A.R. 221.

As to the identity documents he submitted, Sakho testified that he got the birth extract in Senegal from a white man from Mauritania, and that he did not know it was fake. A.R. 203. Sakho testified that he obtained it to get out of the refugee camp. A.R. 204. The refugee camp did not give Sakho any identity documents, and he made no attempt to get proof that he lived at the refugee camp. A.R. 203, 217. Sakho testified that he got the First ID Card in Dakar in order to work, but that he did not know it was fake or altered. A.R. 207. Sakho testified that when the U.S. Government said the First ID Card was not real, he asked his mother to send him good documents. The man who had helped

5

him get the birth certificate gave his mother the Second ID Card and she sent it to Sakho. A.R. 205. Sakho was asked why the Second ID Card said it was issued in 1997. Sakho replied that he sent a photocopy of the First ID Card to his mother, and they used the same date. A.R. 208.

Sakho produced a witness at the merits hearing, Daouda Camara. Camara's affidavit stated that he "first met Boubou Sakho in Kaedi, Mauritania in 1988," in the summertime. A.R. 526. The affidavit stated that Boubou disappeared in 1989 and that he did not see him again until he came to the United States in January 2000. Id. However, when he testified, Camara stated that Boubou's last name was "Diavira," and that it was the only name that he knew him by. A.R. 247-48. Although the affidavit stated that Camara first met Petitioner in 1988, Camara testified that he first met Boubou at a student meeting in Mauritania in 1998. He was asked if he was sure of the date, and he noted that his family was deported in 1989 and he met Boubou around 1998. A.R. 254. Camara testified that he later met Boubou in Philadelphia in 1999, at an apartment complex on Walnut Street. A.R. 255-56. However, Sakho had testified that he did not move to Philadelphia until 2001 or 2002. After Camara testified, Sakho stated that perhaps Camara had been nervous and he had confused Sakho's last name with that of Sakho's mother. A.R. 260-61. When the IJ asked how Camara would know Sakho's mother's last name, he stated that perhaps Camara had "panicked or forgotten." A.R. 260-61.

The IJ denied Sakho's asylum application, finding that he had "failed to convince the Court that he is a native and citizen of Mauritania." A.R. 76. The IJ noted that the

6

First ID Card had been altered, and the birth certificate had been found to be counterfeit. A.R. 68. The IJ noted that Sakho had failed to get any type of identity document from the Mauritanian Embassy and that he had not produced any expert to testify that he was from Mauritania. A.R. 74. The IJ noted the differences between Sakho's affidavit and his testimony, and also stated that Sakho's witness (Camara) was "totally or largely incredible." A.R. 72. The IJ also drew an adverse credibility inference from the fact that Sakho submitted a fraudulent document, based on Matter of O-D-, 21 I&N Dec. 1079 (BIA 1998). A.R. 73-74. The IJ also denied withholding of removal and protection under the Convention Against Torture, and found that Sakho was ineligible for voluntary departure. A.R. 76-77.

The Board of Immigration Appeals dismissed the appeal, finding that the IJ's adverse credibility finding was not clearly erroneous. The Board agreed that Sakho's submission of an altered identity card and a suspect birth certificate undermined the credibility of his entire claim. A.R. 2. The Board noted that Sakho submitted a letter from the Embassy stating that the Second ID Card was genuine, but that the Embassy failed to respond to the Department of Homeland Security's requests that they authenticate the letter. A.R. 2, 214-16, 237-38. The Board also noted the discrepancies between his asylum application and his testimony, and the discrepancies between Sakho's testimony and his witnesses's testimony. A.R. 3. The Board held that the IJ's "adverse credibility ruling provides a sound basis for denying each of the respondent's applications for relief from removal . . . ." A.R. 3. The Board noted that Sakho claimed that his due

7

process rights were violated because he was unable to cross-examine the Forensic Document Examiner who prepared the reports regarding his identity documents, but found there was "no evidence that he requested that the examiner be subpoenaed or otherwise called as a witness in this case." A.R. 3.

Sakho filed a timely, counseled petition for review of the Board's decision.[2]

## II.

In his brief on appeal, Sakho raises two issues. First, he claims that the BIA erred in affirming the IJ's adverse credibility finding based on his "inadvertent submission of a counterfeit document." Petitioner's Brief at 11. Second, he claims that his right to due process was violated because he was not allowed to cross-examine the forensics document laboratory examiner. Petitioner's Brief at 20.

We have jurisdiction to review final orders of removal under section 242(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1252(a)(1), as amended by the REAL ID Act of 2005. When the Board issues a decision on the merits, we generally review only the Board's order. See Li v. U.S. Attorney General, 400 F.3d 157, 162 (3d Cir. 2005); Abdulai v. Ashcroft, 239 F.3d 542, 548-49 (3d Cir. 2001). Where the Board adopts the reasoning of the IJ with some discussion of the bases for the IJ's decision, we also review the order of the IJ. Chen v. Ashcroft, 376 F.3d 215, 222 (3d Cir. 2004). We review an adverse credibility determination under the substantial evidence standard. Xie v.

_____

[2] This Court denied his motion for a stay of removal on June 20, 2007.

8

<u>Ashcroft</u>, 359 F.3d 239, 243 (3d Cir. 2004). We must uphold the credibility determination of the BIA unless "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Adverse credibility determinations based on speculation or conjecture, rather than on record evidence, are reversible. <u>Gao v. Ashcroft</u>, 299 F.3d 266, 272 (3d Cir. 2002).[3]

Sakho argues that the BIA should not have applied a negative inference regarding his credibility based on his submission of a fraudulent document. In <u>Matter of O-D-</u>, the Board held that an IJ was allowed to make a negative inference regarding the credibility of a Mauritanian who submitted a counterfeit identity card and a "probably counterfeit" birth certificate to establish his identity and nationality for purposes of an asylum claim. 21 I&N Dec. at 1082-83. In <u>Kourski v. Ashcroft</u>, 355 F.3d 1038, 1039-40 (7th Cir. 2004), the Court distinguished <u>Matter of O-D-</u>, and held that the Board erred in making an adverse credibility finding based solely on the alien's submission of a fraudulent birth certificate, where the alien testified that he got the document from his mother and that he did not know it was fraudulent. This argument is similar to one made by Sakho. <u>See</u> Petitioner's Brief at 14. However, we find this case is closer to <u>Diallo v. Mukasey</u>, 508 F.3d 451, 454-55 (8th Cir. 2007). In <u>Diallo</u>, the Court noted that "With or without knowledge of the falsity of a counterfeit identification document, the applicant must still confront the basic burden of establishing her identity and nationality, which are

_____

[3] Our review of the IJ's credibility determinations are not governed by the REAL ID Act of 2005, as the asylum application was filed before its effective date.

legitimately in question." Id. at 454. As is the case here, the alien in Diallo produced an identity card that appeared to have been altered, and a forged birth certificate. The Court distinguished Kourski, noting that the IJ's adverse credibility finding in the case before it did not rest solely on the presentation of the questionable documents, but was also based on disparities between the alien's testimony and documentary evidence. The Court held that the adverse credibility finding was supported by substantial evidence. Diallo, 508 F.3d at 455.

Similarly here, although the BIA held that submission of questionable documents undermined the credibility of Sakho's entire claim, it also found that the IJ's adverse credibility finding was supported by the conflicting statements provided by Sakho regarding the mistreatment he experienced in Mauritania, and by the striking inconsistencies between the testimony of Sakho and that of his witness. A.R. 2-3. We do not believe that any reasonable adjudicator would be compelled to conclude that Sakho was credible, and we must therefore uphold the adverse credibility finding.

As to Sakho's claim that his right to due process was violated because he was not allowed to cross-examine the forensics document laboratory examiner, we have reviewed the record and agree with the BIA's finding that Sakho never requested that the examiner be subpoenaed or otherwise called as a witness. In fact, rather than arguing that the examiner's findings must be mistaken, Sakho acknowledged that he learned that the birth certificate and First ID Card were not authentic. A.R. 208, 237. Sakho has thus waived any right to claim at this point that the examiner's report was not valid.

10

For the foregoing reasons, we will deny the petition for review.